```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
                       EASTERN DIVISION

CHICAGO TEACHERS UNION,        )
LOCAL NO. 1, AMERICAN FEDERATION)
OF TEACHERS, AFL-CIO, et al.,  )
                               )
           Plaintiffs,         )
                               )
    v.                         )   No.  12 C 10338
                               )
BOARD OF EDUCATION OF THE CITY )
OF CHICAGO,                    )
                               )
           Defendant.          )
```

## MEMORANDUM OPINION AND ORDER

Chicago Teachers Union, Local No. 1 ("Union") and several individual teachers ("the individual plaintiffs") have filed suit against the Board of Education of the City of Chicago ("Board"), claiming that Board violated Title VII of the Civil Rights Act of 1964 ("Title VII," 42 U.S.C. §2000e to 2000e-17) when it instituted a layoff plan that resulted in termination of the employment of a number of African American teachers and paraprofessionals.[1]  Union and the individual plaintiffs wish to pursue their claims as a class under Fed. R. Civ. P. ("Rule") 23, with the class defined in these terms (Compl. ¶9):

> All African American persons terminated by the Board of
> Education of the City of Chicago as a tenured teacher
> or staff, as defined by the labor agreement between the
> Chicago Teachers Union and the Board of Education,

---

[1] All "Complaint" references speak of the First Amended Complaint (Dkt. 5), which will be cited "Compl. ¶--."  Board's memorandum will be cited "B. Mem.--," Union's response will be cited "U. Mem.--" and Board's reply memorandum will be cited "B. R. Mem.--."

pursuant to the Board's "layoff policy" on or after the 2011 calendar year.

Board has filed a Rule 12(b)(1) motion to dismiss Union as a party plaintiff, asserting that it lacks standing to pursue its claim. Board argues that the relief sought by Union creates a conflict of interest between it and its members not included in the class. For the reasons stated in this opinion, Board's motion is denied at this time.

**Standard of Review**

Defendants may challenge standing under Rule 12(b)(1) on either facial or factual grounds. As to the first alternative, such challenges "require only that the court may look to the complaint and see if the plaintiff has sufficiently <u>alleged</u> a basis of subject matter jurisdiction" (<u>Apex Digital, Inc. v. Sears, Roebuck & Co.</u>, 572 F.3d 440, 443 (7th Cir. 2009)(emphasis in original)). By contrast, "a factual challenge lies where the complaint is formally sufficient but the contention is that there is <u>in fact</u> no subject matter jurisdiction" (<u>id.</u> at 444, internal quotation marks omitted and emphasis in original). To that end the "district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists" (<u>id.</u>, internal quotation marks omitted).

Board does not specify whether it is attempting a facial or

a factual challenge to Union's standing, but it appears to be pursuing the latter course. In either event a plaintiff such as Union bears the burden of establishing standing (Retired Chicago Police Ass'n v. City of Chicago, 76 F.3d 856, 862 (7th Cir. 1996) ("RCPA II")). In the case of a factual challenge, a plaintiff bears the burden of supporting standing with "competent proof," meaning that plaintiff must "show[ ] by a preponderance of the evidence, or proof to a reasonable probability, that standing exists" (id.).

## Statement of Facts[2]

Union is a "labor organization" "representing over 30,000 professional educators and Board of Education employees" (Compl. ¶10). It is the "exclusive bargaining representative for all teachers and paraprofessional and School Related Personnel ("PSRP") in CPS [the Chicago Public School system]" (id.).

Board operates the Chicago Public School System ("the School System")(Compl. ¶2). It is responsible for the administration of approximately 685 schools in Chicago's 77 neighborhoods (id.). It employs approximately 23,000 teachers, 16,500 of whom are tenured (id. ¶66). Approximately 47% of the tenured teachers are Caucasian, approximately 29% are African American and approximately 24% are non-African American minorities (id. ¶¶67-

---

[2] As this opinion does not deal with any of the substantive issues on the merits, this Statement of Facts will be brief.

69).

During the relevant time period Board and Union were parties to a collective bargaining agreement (B. Mem. at 2, Ex. 1). Invoking its position in relation to Board, Union has brought suit to "redress defendant's pattern and practice of discrimination against a class of African American teachers and paraprofessionals by terminating their employment pursuant to a layoff policy which has a disparate impact on African Americans" (Compl. ¶1).

Union alleges that the decline in the African American teaching force in the School System (down to approximately 28.7% in 2011 from 40.6% in 2000) "corresponds directly with a series of layoffs and school actions conducted by Defendant" (Compl. ¶¶4-5).[3] Union alleges that Board targets South and West Side schools (where "most" of the School System's African American teachers are employed) for "layoff at a higher rate" (id. ¶¶4, 6, 39-40). According to Union that policy "disproportionately affect[s] African American teachers and staff" and has a disparate impact (id. ¶¶6, 101-05).

## Standing

For standing-to-sue purposes the general rule is that "an

---

[3] As the details of the layoff policy are not salient to this opinion, they will not be discussed in detail here. Complaint ¶¶41-64 provides a more thorough discussion of the policy.

4

injured party must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties" (RCPA II, 76 F.3d at 862, internal quotation marks omitted). But in certain situations an organization may have "associational standing" to represent the rights of its members, as when (id. at 862-63, quoting Hunt v. Wash. State Apple Adder. Comm'n, 432 U.S. 333, 343 (1977)):

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

Neither side disputes that (a) and (c) of the Hunt test are met. But Board challenges Hunt requirement (b), arguing that a conflict of interest exists that precludes Union from asserting associational standing.

On that score "an association fails to meet the second prong [of the Hunt test] where there is a serious conflict of interest between the organization and its members" (RCPA II, 76 F.3d at 863), a concept that requires the conflict to be "profound" (id. at 864). And to that end RCPA II has recognized at least two types of conflicts that will defeat associational standing: (1) "where an association seeks standing to directly sue some of its own members" and (2) "where the association's suit, if successful, would cause a direct detriment to the interests of its members and the litigation is not properly authorized" (id.).

5

Only the second of those types of conflict is at issue here.

Two concerns are implicated when the second type of conflict is at issue: (1) "a concern that the litigation is not germane to the association's purposes" and (2) "a concern that the association will not be fully committed to the litigation and, as a result, will not pursue the litigation with the zealous advocacy necessary to be an adequate representative" (RCPA II, 76 F.3d at 864-65). RCPA II, id. at 865 tells us, however, that "[these concerns are allayed where the litigation was properly authorized in accordance with the association's procedures." Accordingly Union may defeat Board's challenge to its associational standing by showing either that the litigation will not cause a direct detriment to any of its members or by showing that the litigation was properly authorized (id.). Board contends that Union can make neither of those showings.

**Direct Detriment**

Board first argues that this action creates a "profound conflict of interest" between Union and its members because if the laid-off teachers are rehired some currently-employed teachers (also Union members) will necessarily be disadvantaged. Board cites three potential conflicts in support of its argument. First, Board asserts that if the discharged African American teachers are reinstated, the other teachers who replaced them will be displaced (B. Mem. 7). Second, Board argues that even if

6

reinstatement of the discharged teachers would not displace any currently-employed Union teachers, "it may unfairly compromise their seniority, putting purported class members ahead of other [Union] members who were not displaced in 2012" (id.). And third, Board contends that there is a direct detriment to non-African American Union members because the African American class members "would receive preferential treatment" in rehiring decisions "regardless of seniority or other relevant factors" (id. at 8).

Union responds that Board is merely speculating about potential detrimental effects that will not in fact come to fruition. As for the claimed displacement of currently-employed teachers, Union asserts that it is seeking (1) reinstatement of its affected members into the same positions or substantially similar positions or (2) front pay and benefits. Union cites a March 2013 list of some 400 job openings in the District (U. Mem. 5) and asserts that a successful resolution of its suit will leave Board with several alternatives, not necessarily requiring the displacement of any currently-employed teachers. As to the issue of seniority, Union acknowledges that it is "possible" that the rehired teachers may move ahead of newly-hired teachers in seniority status, but it urges that because it was Board's own alleged wrongdoing that caused the issue, "Board can hardly use its own wrongdoing to deny standing to [Union] to protest the

7

wrong inflicted on its members" (id. at 5).[4] Finally, Union addresses Board's argument that the rehired teachers will receive "preferential" treatment by stating that any reinstatement remedy would simply be "a return to the position they would have held but for the unlawful conduct" (id. at 7).

Union's latter two arguments--however persuasive they may be in equitable terms--really do not address the question whether or not there is a conflict--whether or not some Union members will be directly harmed by the remedy sought in this lawsuit. Simply put, whether or not it is framed as "preferential" or a "return to the status quo," there is a conflict if one group of Union members will be benefitted at the expense of another group of Union members.

In that respect this Court does not write on an entirely clean Seventh Circuit slate. First, fully four decades ago Air Line Stewards and Stewardesses Ass'n, Local 550 v. Am. Airlines, 490 F.2d 636 (7th Cir. 1973)("Air Line Stewardesses") made clear that unions are subject to the ordinary rules of standing.[5]

---

[4] On the next page of its memorandum, Union also challenges Board's factual assertion by stating that "In regards to seniority, there will be no actual change to the seniority status of younger teachers. If, for instance, a teacher has worked for five years, no remedy awarded as a result of this lawsuit will nullify the teachers' five-year tenure status" (U. Mem. 7).

[5] It must be noted that Airline Stewardesses addressed the issue of associational standing under the rubric of Rule 23(a), asking whether the claims of a representative plaintiff are typical of the claims of the class and whether the representative

8

There a class of female stewardesses[6] and their union sued American Airlines under Title VII, alleging that the airline had a policy of firing female stewardesses once they became pregnant. Under the settlement reached by the parties, the discharged stewardesses would be placed on a "preferential hiring list, to be employed to fill vacancies before others were hired" (id. at 638). Those rehired stewardesses would also have the same level of seniority they had enjoyed up to the respective dates of their termination (id.). Our Court of Appeals rejected Union's arguments defending its standing, stating (id. at 642, internal quotation marks, citations and footnotes omitted, emphasis added):

> We think a union may serve its members by being plaintiff in a suit to vindicate their civil rights. There is nothing in the law which precluded the Union from recognizing the injustice done to a substantial minority of its members and from moving to correct it. When it espouses the interest of one group of its members, it doubtless has an obligation of fairness to

---

plaintiff will fairly and adequately protect the interests of the class (id. at 640). That approach to evaluating associational standing was disavowed by our Court of Appeals less than three years later in Local 194, Retail, Wholesale and Dep't Store Union v. Standard Brands, Inc., 540 F.2d 864, 867 (7th Cir. 1976) ("Local 194"). Although the same standards may be "applicable by analogy" (id.), the standards "while similar, [are] not identical" (RCPA II, 76 F.3d at 864, internal quotation marks omitted). Hence the cases evaluating the question under a Rule 23 framework may be useful but are not necessarily controlling.

[6] In the 40 years since Air Line Stewardesses the job title has changed to "flight attendants," but in keeping with the language of that case, this Court will perforce use the nonegalitarian term "stewardesses" throughout this discussion.

9

any members whose interests are in conflict. But except
for the area of collective bargaining and its necessary
incidents, <u>the Union has no unique authority to
compromise the rights of its members</u>. Its adequacy as a
representative party in a class suit, and its authority
to compromise the rights of its members in a class suit
when such rights do not arise out of collective
bargaining agreements <u>are to be tested and judged in
the ordinary way</u>.

Just a few years later <u>Local 194</u>, 540 F.2d at 866 again spoke to the issue of a union's associational standing.[7] In that case a class of "blacks, Spanish-surnamed persons, and women" and their union sued their employer under Title VII, alleging discrimination in hiring and promotion. <u>Local 194</u>, <u>id.</u> at 866 first found that Union did have standing to seek injunctive and declaratory (but not monetary) relief on behalf of its members and then went on to address specifically the issue of "conflicting interests." As <u>Local 194</u>, <u>id.</u> stated (emphasis added):

> Often a union finds itself in the position of
> representing a membership whose interests conflict, not
> only in Title VII cases, but in its collective
> bargaining role. <u>This does not disqualify it from
> acting at all</u>. Union's duty is to represent fairly the
> interests of all members without discrimination towards
> any.

Our Court of Appeals again addressed the issue, this time specifically applying the <u>Hunt</u> test, in <u>RCPA II</u>, 76 F.3d at 862-67. There the Retired Chicago Police Association brought suit

---

[7] Both <u>Air Line Stewardesses</u> and <u>Local 194</u> were decided pre-<u>Hunt</u> and, of course, did not address the three-factor test that controls this case.

10

challenging a settlement between the City of Chicago and certain of its pension funds because of the settlement legislation's effect on certain healthcare costs. After a thorough discussion of associational standing and the Hunt test, the court found that a "profound" conflict of interest existed because if the RCPA was successful in invalidating the settlement legislation, certain members of the association would be "directly harmed" because they would lose the subsidy provided to them by the legislation and their health care premiums would increase by $4 every month (id. at 865).[8] That "direct detriment" to other association members defeated the RCPA's standing.

While Local 194 and RCPA II may seem to be somewhat at odds, RCPA II is the only case to use the Hunt framework and address the specific issue of "profound conflicts," and the situation there is analogous to Board's characterization of the situation posed by this case. In claimed support of that characterization Board has tendered a declaration of Lauren Clair-McClellan, a human resources employee in the School System (B.R. Mem. Ex. 2).

For its part Union argues that currently-employed teachers will not necessarily be harmed. In partial support of that position Union cites the earlier-referred-to website that lists approximately 400 open jobs into which the plaintiff teachers

---

[8] RCPA II, id. at 866-67 also found another conflict, not analogous to the case at bar, based on a breach of fiduciary duty.

could be placed.[9] And as stated earlier, Union also says that its goal is flexible: It need not take the form of placing the teachers into the same spots that they originally held, but can alternatively place them in similar positions or award them backpay.[10]

To be sure, it is Union's burden to establish standing "by a preponderance of the evidence, or proof to a reasonable probability, that standing exists" (RCPA II, 76 F.3d at 862). Or as RCPA II, id. at 865 goes on to say:

> [W]here a defendant asserts that a direct-detriment conflict of interest precludes an organization from asserting associational standing, the organization bears the burden of coming forward with competent proof to rebut the challenge.

But Board and its counsel have forgotten--or perhaps have preferred to ignore--that this opinion is not being issued in a vacuum. As it is being written, Board is awash in a sea of uncertainty. Just to name the enormous problem that continues to receive the greatest degree of public scrutiny, Board is at the outset stage of implementing a massive set of school closings, with its own program for doing so very much in a state of flux. And every day's newspaper and television coverage speaks of other

---

[9] That list is dated March 28, 2013. Obviously the list will not remain static throughout the course of this litigation.

[10] Union acknowledges that it does not have standing to seek backpay (see Local 194, 540 F.2d at 865), but that does not impede the individual plaintiffs from doing so.

complex factors making Board's and its teachers' future paths highly uncertain.[11] In this extraordinarily dynamic rather than static state of affairs, Board's hypothetical contentions about potential conflicts are rendered even more iffy.

What emerges from all of this is that more <u>factual</u> development is essential before it can be determined whether Union is to be forced out of this lawsuit on a lack-of-standing basis as a matter of <u>law</u>. In many ways the situation is analytically similar to a request for a grant of qualified immunity by a state actor in a Section 1983 lawsuit, where the result hinges on the resolution of which side's version of disputed facts proves to be accurate (see, e.g., <u>Pearson v. Callahan</u>, 555 U.S. 223, 238-39 (2009)). In that context the Supreme Court has taught that the denial of such a motion in the early stages of the lawsuit is the proper course of action.

---

[11] Last Sunday's June 16 <u>Chicago Tribune</u> sec.1, p.7, col. 1 has elaborated on the <u>Tribune</u>'s day-earlier report that the massive school closings will carry with them the layoffs of 420 teachers, many with tenure (some with satisfactory, others with unsatisfactory, ratings). Another 125 teachers will be laid off as the result of "turnarounds" at five schools slated for overhauls. This Court is not of course minimizing the serious problems posed by Board's anticipated budget shortfall of nearly $1 billion during the coming years--Union's Vice President is quoted in the <u>Tribune</u> article as speculating that as many as 1,000 to 2,000 layoffs could be in the offing. It is a mistake to think of the issues presented here as though they involved a figurative snapshot of a stable situation, rather than a motion picture of a changing situation. What is undeniable is that neither side is in possession of a crystal ball, let alone an unclouded one. And that uncertainly confirms the wisdom of the no-decision decision announced here.

Just so here. This action will carry on with or without Union, for the separately represented individual plaintiffs are not targeted by Board's present motion. But further developments as to those persons might render some issues inappropriate for resolution, so that Union's continued presence would be essential to a total outcome. Moreover, any disparity in the resources needed to litigate the issues as between Board and the individual plaintiffs would be less of a factor--or perhaps a nonfactor--with Union still in the case.[12] In short, Board's motion is best denied at this time, without prejudice to its possible renewal if future factual developments reveal the real world likelihood of the required "profound conflicts."

**Authorization**

That really dispatches Board's motion for a determination as a matter of law at this point, but the just-stated possibility of a need to reexamine the question at a future date in light of future developments makes it appropriate to look at the second branch of the RCPA II analysis: the prospect that even if a direct detriment to the interest of some of Union's constituents were to be shown, the conflict could still be waived if Union obtained proper authorization. As RCPA II, 76 F.3d at 865 has

---

[12] Although this is not an (let alone the) analytical basis for the conclusion reached here, it is worth noting that the result arrived at in this opinion enhances the prospect that the ultimate battle on the merits of the case will be waged (as all legal issues ought to be) on a level playing field.

14

put it, once a "direct detriment" has been shown, the plaintiff must show that "the litigation was properly authorized in accordance with the association's procedures."

On that score Board contends Union has not alleged that it obtained such authorization, while Union responds that it is "inherently authorized [to bring this action] by virtue of its status as the exclusive representative of all CPS teachers" (U. Mem. 8). Union argues that it is certified under Illinois law as the exclusive representative of the interests of its members "even when those interests conflict" and that it is in fact Union's job to resolve those conflicts (id. at 8-9). Union attempts to distinguish RCPA II, which required some affirmative showing of an authorization, because RCPA II involved a "voluntary association," whereas Union has "inherent authorization" (id. at 9).

RCPA II, 76 F.3d at 865 imposed the authorization requirement because once the membership of an association has "affirmed that the detriment to some members' interests does not render the litigation outside the germane interests" of the group, "a court can be assured that the association will pursue the litigation with the strong advocacy and persistence necessary to be an effective representative." Hence no notion of "inherent authorization" would be in keeping with the policy behind the requirement, for if all conflicts were automatically waived by

15

default there would be nothing to give the courts the assurance described by RCPA II.  That case made no statement as to a distinction between "voluntary associations" and unions, as urged by Union, and the latter cites no authority to support such a proposition.  In sum, if the issue decided here became appropriate for a fresh look in the future as to a real rather than hypothetical conflict, Union would have to make a better showing.

**Other Measures**

One last possible issue for potential future consideration bears mention.  Before this Court could rule that associational standing does not exist, it would be required to assess whether, in the language of our Court of Appeals at an earlier stage of the same litigation that later produced the RCPA II opinion (Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584, 607 (7th Cir. 1993) ("RCPA I")):

> other approaches less drastic than denying group standing will provide adequate protection for the interests of those whose position is not represented by the group, while affording the group and the judicial system as a whole the efficiencies that [Int'l Union v.]Brock, [477 U.S. 274 (1986)] has identified in associational standing.

Here this Court sees no less drastic alternative.  If future events were to call for dismissal of Union as a plaintiff on lack-of-standing grounds, the quoted RCPA I teaching would not negate that outcome.

16

## Conclusion

For the above-stated reasons, Board's current motion for Union's dismissal is denied. Union will remain a party to the action. This Court sets the next status hearing for 9:15 a.m. June 25, 2013.

_____
Milton I. Shadur
Senior United States District Judge

Date: June 18, 2013