**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **CHICAGO TEACHERS UNION, LOCAL 1, AMERICAN FEDERATION OF TEACHERS, AFL-CIO**, **TERRI FELLS**, **LILLIAN EDMONDS**, and **JOSEPHINE HAMILTON PERRY**; individually and on behalf of all similarly situated persons, )<br><br>Plaintiffs, )<br><br>v. )<br><br>**BOARD OF EDUCATION OF THE CITY OF CHICAGO**, a body politic and corporate, )<br><br>Defendant. ) | Case No. 12 C 10338 |

## MEMORANDUM OPINION AND ORDER

Chicago Teachers Union, Local 1 ("Union") and three individual teachers ("the individual plaintiffs") have filed suit against the Board of Education of the City of Chicago ("Board") claiming that Board violated Title VII of the Civil Rights Act of 1964 ("Title VII," 42 U.S.C. §§ 2000e to 2000e-17) when it carried out a large-scale series of layoffs that resulted in the termination of employment of a great many African American teachers and paraprofessionals. Plaintiffs now move for certification of their lawsuit as a class action for injunctive relief under Fed. R. Civ. P. ("Rule") 23(b)(2) and for damages under Rule 23(b)(3), or in the alternative for certification of their designated class for resolution of the issue of liability under Rule 23(c)(4). They describe the class they seek to certify in these terms (P. Mem. 8):

> All African American persons whose employment as a tenured teacher or staff member, as defined by the collective bargaining agreement between the Chicago Teachers Union and the Board of Education of the City of Chicago, was terminated by the Board of Education pursuant to its "layoff policy" in 2011.

In response Board opposes any certification.[1]  For the reasons set out in this opinion, this action is certified for class treatment under Rules 23(b)(2) and 23(b)(3), thus mooting plaintiffs' alternative Rule 23(c)(4) motion.

## Factual Overview

Board, a "body politic and corporate" organized under the Illinois School Code (105 ILCS 5/34-2), maintains the Chicago Public Schools (CPS), a free public school system within the City of Chicago (Answer ¶ 34).  Union is a labor organization that represents teachers and other CPS employees, over 30,000 in total (id. ¶ 10).  At all times relevant to this action (including the present) Union and Board have been parties to a collective bargaining agreement ("CBA") (B. Resp. Mem. 6, Ex. 1).  Finally, the individual plaintiffs are former CPS teachers who were laid off by Board from their positions as full-time tenured teachers in 2011 (id. ¶¶ 13, 18, 32).  All three individual plaintiffs are African Americans (id. ¶¶ 11, 19, 27).

Board employs a number of teachers and other personnel in a variety of positions that are funded from different sources and assigned to schools according to different criteria.  Plaintiffs and Board dispute some of the details of how those positions are categorized and assigned to schools, but they agree that in 2011 Board laid off at least 1,080 teachers and roughly 400 educational paraprofessionals who were Union members (B. Resp. Mem. 13).  Plaintiffs and Board dispute the number of teachers and paraprofessionals who ultimately suffered adverse employment action as a result of the layoffs -- at least some were able to transfer to equivalent

---

[1]  This opinion identifies plaintiffs' and Board's respective submissions as "P." and "B." followed by appropriate designations: the memorandum in support of the motion for class certification as "Mem. --," the response as "Resp. Mem. --" and the reply as "Reply Mem. --".

positions -- but Board concedes that there were some 700 teachers and paraprofessionals in total who were unable to transfer (id.).

Board chalked up the layoffs to declining enrollment and a shrinking budget (B. Resp. Mem. 9). It conducted the layoffs according to three policies (Board Policies 504.2, 504.2A and 505.6) that authorized layoffs for precisely those kinds of economic and demographic reasons (B. Resp. Mem. 8, 12). Under those policies Board (through its CEO) can select positions for layoff according to a number of criteria. In the case of the 2011 layoffs, Board's budget office and demographic office worked together to select schools where layoffs would occur. It was then up to the principals of those schools to select positions to cut, and another central office reviewed the principals' recommendations, accepting some and rejecting others (B. Resp. Mem. 9-13).

Plaintiffs' main bone of contention is that the schools Board selected for layoffs were disproportionately located in African American neighborhoods, and thus (say plaintiffs) the layoffs had a predictably disparate impact on African American teachers and staff. That is because in those schools the employees as well as the students were disproportionately likely to be African Americans (P. Mem. 1). According to plaintiffs, 29% of all CPS tenured teachers are African Americans, but 39.6% of the tenured teachers terminated were African Americans (Am. Compl. ¶ 7; P. Mem. 7).[2] Board does not deny that it selected which schools would have to lay

_____

[2] As the ensuing quotation from Complaint ¶ 7 reflects, the percentage of African Americans referred to in the text as having been laid off is 2.4% lower than the number in the original Complaint. In support of that new number, plaintiffs cite to a spreadsheet listing all laid-off employees, their respective job types and their demographic information including race (id.). It is unclear -- but quite irrelevant -- whether that spreadsheet (and thus the new percentage) was the product of discovery provided by Board or resulted instead from a further examination of Union's own records.

off teachers (B. Resp. Mem. 9-10), but it adds that the principals at those schools had significant (albeit not final) discretion over which teachers to lay off (id. at 10-11).

And what does Board say on the critical issue of disparate impact in this critical case? Here are Amended Complaint ¶¶ 7 and 8 and Board's "responses":

> 7.    In June, 2011, the Board terminated the employment of 931 classroom teachers through a round of layoffs. 480 of these teachers were tenured. African Americans made up 42% of the tenure teachers terminated, although constituting less than 29% of all CPS tenured teachers.
>
> **ANSWER:**    The Board denies the allegations of paragraph 7.
>
> 8.    Defendant's pattern and practice of targeting schools with high African American teaching populations for layoffs has a disparate impact on African American tenured teachers and staff.
>
> **ANSWER:**    The Board denies the allegations of paragraph 8 and further states that the Board does not "target" schools, or any demographic of teachers or staff, for layoffs under any circumstance.

And that's it -- the sum total of Board's purported input on the subject of disparate impact, which is of course the essential linchpin for class certification purposes. Board has said not a word, then or since then, about the claimed basis for its unsupported ipse dixit "denial."

In candor, that is totally irresponsible. This action has been pending for just short of 2-1/2 years: Plaintiffs filed their initial Complaint on December 26, 2012, and Board has known from day one about plaintiffs' disparate impact contention and about the asserted numbers upon which those contentions rely -- numbers asserted by responsible plaintiffs' counsel well aware of the obligations imposed on such a pleading by Rule 11(b). Both sides have been in active litigation in the intervening period, and n.2 reflects that plaintiffs have provided a current refinement on the original pleading figure.

But from Board?  As already stated, <u>nothing</u> -- yet it is after all Board's own self-maintained and self-known statistics that have to provide grist for the mill of any good faith denial of plaintiffs' assertions.[3]  Yet the current duel about class certification has been waged without any submission whatever from Board to underpin its original unexplained denial.

It is frankly astonishing under the circumstances for Board and its counsel to challenge plaintiffs' position because of an asserted lack of support, for it is Board and its counsel who themselves have all of the numbers at their command.  That flouts common sense, and this Court summarily rejects that non-defense on the disparate impact front.

**Class Certification**

Certification of a class under Rule 23(c) is appropriate only if it satisfies all four prerequisites of Rule 23(a) and at least one of the criteria of Rule 23(b).  Here plaintiffs are seeking certification under both Rule 23(b)(2) (to the extent that they seek injunctive relief) and Rule 23(b)(3) (to the extent that they seek damages).  They have the burden of showing by a preponderance of the evidence that they have met all the required elements of the Rule (<u>Messner v. Northshore Univ. HealthSys.</u>, 669 F.3d 802, 811 (7th Cir. 2012)).  This opinion will go down the line of those Rule 23 prerequisites in order, setting out specific facts and legal standards as necessary.

**Rule 23(a)(1):  Numerosity**

Under Rule 23(a)(1) a class can be certified only if "the class is so numerous that joinder of all members is impracticable." Unsurprisingly Board does not contest plaintiffs' assertion that

_____

[3]  This Court is of course well aware that Board's counsel are also duty bound to comply with Rule 11(b).  But this is not a threshold Rule 12(b)(6) skirmish about the viability of plaintiffs' Complaint, but rather a well-advanced substantive dispute about the appropriateness of class certification.

their proposed class would be sufficiently numerous (B. Resp. Mem. 17 n.2).  Indeed, even if this Court were to credit Board's rather than plaintiffs' calculation of the class size -- a determination that need not be made at this juncture -- the proposed class would still include over 500 members, clearly satisfying the requirements of Rule 23(a)(1).

## Rule 23(a)(2):  Commonality

Rule 23(a)(2) requires plaintiff to show that "there are questions of law or fact common to the class."  As <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541, 2551 (2011) (citation and internal quotation marks omitted) teaches:

> Commonality requires the plaintiff to demonstrate the class members have suffered the same injury. . . . Their claims must depend upon a common contention -- for example, the assertion of discriminatory bias on the part of the same supervisor.  That common contention, moreover, must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

Despite Board's lengthy exhortations to the contrary, the proposed class clearly has a claim that depends upon a common issue:  whether Board's policy of selecting schools for layoffs caused (intentionally or not) a disparate impact on African American employees, in violation of Title VII.[4]  And it is incontrovertible that the proposed class suffered a common

---

[4]  This opinion resorts to that somewhat confusing formulation because plaintiffs allege simultaneously that Board's selection of schools for layoffs resulted in a disparate impact on African American employees -- a theory that requires no showing of intentional discrimination (<u>Puffer v. Allstate Ins. Co.</u>, 675 F.3d 709, 716-17 (7th Cir. 2012)) -- <u>and</u> that Board violated its own policies by exempting from layoffs certain schools on Chicago's more-heavily-white North Side even though those schools also saw significant drops in enrollment (see Am. Compl. ¶¶ 76-81).  That latter allegation amounts to an assertion that Board's stated reasons for the layoffs are pretextual, which of course supports an inference of intentional discrimination (see <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 147-48 (2000)).  Hence the single set of facts that plaintiffs have alleged can be read to support either a disparate impact or a disparate treatment theory of discrimination.

injury as a result of that policy: They were laid off. Plaintiffs' contention is thus a common one not only "capable of classwide resolution" but also "central to the validity of each one of the [class members'] claims" (id.). Either Board's policy of selecting schools violated Title VII by causing a disparate impact that harmed the proposed class members or it did not. That alone is enough to satisfy Rule 23(a)(2).

Truth be told, Board seems to have fundamentally (and inexplicably, given the lucidity of plaintiffs' briefing) misapprehended plaintiffs' argument. Board's memorandum reads as if it thought plaintiffs were asserting that Board (not its school principals) individually selected each and every injured employee for layoff. Were that indeed plaintiffs' theory of harm, Board would have solid arguments to make against a finding of commonality, for it appears undisputed that in reality it was principals who exercised significant (but by no means unguided) discretion in selecting which teachers to recommend for layoffs at their respective schools. To adopt for a moment (purely arguendo, of course) Board's flawed understanding of plaintiffs' contentions, it is even possible that the principals' discretion was so unfettered that class members would have no "common contention" within the meaning of Wal-Mart, at least insofar as they were laid off from different schools, because in that case there would be no single policy that could be said to have caused their separate injuries. One principal might have recommended her teachers for layoff based on race, another based on performance and still another based on hair color, but there would have been no single policy dictating their choices. And as Bolden v. Walsh Constr. Co., 688 F.3d 893, 898 (7th Cir. 2012) noted, "This single . . . policy was the missing ingredient in Wal-Mart" that prevented class certification.

But so much for unsupportable might-have-beens -- here there was a single policy (though it comprised three "Policies" in Board's internal lingo) under which Board consigned

some schools to layoffs and spared others from them. Board has admitted as much (B. Resp. Mem. 9-11), although it might not have done so quite as readily had it better grasped plaintiffs' theory of the case. And <u>McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 672 F.3d 482, 490 (7th Cir. 2012) has made it totally clear that commonality exists when, as here, a class of employees asserts that a single policy caused a disparate impact in violation of Title VII -- even when that single policy incorporated some discretion at the local level. That is precisely the case here, and so this Court finds that "there are questions of law or fact common to the class," satisfying the requirements of Rule 23(a)(2).

## Rule 23(a)(3): Typicality

What is known as "typicality" reflects the Rule 23(a)(3) requirement that "the claims or defenses of the representative parties [be] typical of the claims or defense of the class." <u>Oshana v. Coca–Cola Co.</u>, 472 F.3d 506, 514 (7th Cir.2006) (citations and some punctuation marks omitted) has explained the requirement this way:

> A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and her claims are based on the same legal theory. Even though some factual variations may not defeat typicality, the requirement is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large.

Hence class representatives have been found not typical of the class when they had to rely on a legal theory different from that applicable to other class members (see, e.g., <u>Muro v. Target Corp.</u>, 580 F.3d 485, 492-93 (7th Cir. 2009)).

In this instance all of the proposed class representatives base their claims on the same legal theory: racial discrimination in violation of Title VII. So the fact that the individual plaintiffs were tenured teachers while the class also includes staff subject to the CBA between Union and Board -- a contrast that Board unpersuasively asserts defeats typicality (B. Resp.

Mem. 3) -- does nothing to affect the individual plaintiffs' typicality.[5]  Tenured teachers and staff all assert the same legal theory of discrimination that occurred as a result of Board's selection of schools for layoffs.

Board also contends that the individual plaintiffs are not typical because two of them received unsatisfactory performance reviews (Fells and Perry) and the other (Edmonds) retired after being unable to find work (B. Resp. Mem. 25-26).  But that contention similarly misses the mark.

As to Fells and Perry, the fact that they were assertedly performing poorly on the job does nothing to differentiate them from other members of the class.  Board certainly is not contending that poor performance was the sole reason Fells and Perry were laid off, nor that their performance was so substandard that they would have been singled out for firing (among thousands of CPS teachers) even had their schools never been selected for layoffs by Board.  To the contrary, Board presages its attack on Fells' and Perry's typicality with a reminder that Board's own policy was the reason that their schools were chosen for layoffs in the first place (id. at 25).  As if that were not enough, Board also admits that the layoff policy that is the central concern of this lawsuit required low-performing teachers at the schools selected for layoffs to be let go before others were (id.).  That means that, having been rated as poor-performing teachers, Fells and Perry are in an odd sense more typical of the class than they otherwise would be.

As for Edmonds, the fact that she retired after being laid off really has no bearing on the typicality determination, which (as already mentioned) focuses on whether the representative's

_____

[5]  Board raises no challenge to Union under Rule 23(a)(3), and this Court finds that Union's claim of disparate impact discrimination (asserted on behalf of its members) is typical of the class' claims.

claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members" (Oshana, 472 F.3d at 514). Board's argument is essentially that Edmonds would be entitled to receive less backpay (or damages) than would other class members if plaintiffs were to prevail in establishing liability. But it is well established that class representatives need not have been injured to the same extent as other class members in order to be typical of the class (see De La Fuente v. Stokely-Van Camp, Inc., 713 F.2d 225, 232-33 (7th Cir. 1983), a case still cited regularly by our Court of Appeals for its discussion of Rule 23(a)(3)).

Finally, Board argues that individual plaintiffs were selected by their respective principals for layoffs because of idiosyncratic reasons such as personal animosity (B. Resp. Mem. 25-26). More than anything else, that argument reflects once again Board's fundamental failure to come to grips with plaintiffs' theory of the case. Plaintiffs do not assert their claims under legal theories specific to their respective principals' exercise of discretion. Rather, similar to the plaintiffs in McReynolds, they argue that a single policy of Board caused the principals' exercise of discretion to result predictably in a disparate impact on African American employees in the aggregate. So Fells' purported belief that her principal was "evil" (B. Resp. Mem. 25) and Perry's belief that her principal was retaliating against her for complaining about his leadership (id. at 26) are quite beside the point. In sum, the individual plaintiffs' claims are typical of the class's within the meaning of Rule 23(a)(3).

**Rule 23(a)(4): Adequacy**

Rule 23(a)'s final requirement is that "the representative will fairly and adequately protect the interests of the class (Rule 23(a)(4)).[6] As <u>Rosario v. Livaditis</u>, 963 F.2d 1013, 1018 (7th Cir. 1992) has taught in an oft-quoted formulation:

> A class is not fairly and adequately represented if class members have antagonistic or conflicting claims.

While potential but as-yet-unrealized conflicts will render a proposed class representative inadequate (see <u>Randall v. Rolls-Royce Corp.</u>, 637 F.3d 818, 824 (7th Cir. 2011)), purely speculative conflicts or mere differences in entitlement to relief will not affect a proposed representative's adequacy (<u>Johnson v. Meriter Health Servs. Employee Ret. Plan</u>, 702 F.3d 364, 372 (7th Cir. 2012)).

It cannot be gainsaid that the individual plaintiffs clearly meet the requirements of Rule 23(a)(4). Board does not point to a single conflict of interest, real or potential, that would impair the ability of any of the individual plaintiffs to represent the interests of the class fairly and adequately. Board does make the conclusory statement that the individual plaintiffs' <u>former</u> entitlement to remedies reserved for tenured teachers under the CBA now creates a "potential conflict of interest" (B. Resp. Mem. 26-27). But Board does not say how the terms of a since-expired CBA could somehow create a conflict of interest in this action -- nor does this Court see how that would be possible. Hence the individual plaintiffs are adequate representatives of the class.

---

[6] Board does not challenge the adequacy of Union's or the individual plaintiffs' respective attorneys, and this Court finds them adequate.

But a separate inquiry is required into Union's adequacy. As a general matter, there is nothing about unions per se to make them inadequate representatives of their members' interests -- even a minority of their members' interests (Air Line Stewards & Stewardesses Ass'n Local 550, TWU, AFL-CIO v. Am. Airlines, Inc., 490 F.2d 636, 642 (7th Cir. 1973)). Unions must simply meet the standard of Rule 23(a)(4) on the same basis that any other representative party would. Still, because unions are organizations whose membership often comprises both class members and non-class members, they can run afoul of the requirements of Rule 23(a)(4) when some of their members would be harmed by the relief that the class members are seeking (see Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584, 598 (7th Cir. 1993)).

Here Board first asserts that Union suffers from an irreconcilable conflict of interest because, should plaintiffs prevail, non-African American members of Union "would not benefit" (B. Resp. Mem. 27). But Board nowhere contends that the suit would cause non-African American Union members any detriment. Board does not assert, for example, that reinstating class members with full seniority would disadvantage other Union members' seniority, a common conflict of interest that unions face in prosecuting class actions that seek reinstatement (see, e.g., Air Line Stewards, 490 F.2d at 640).[7] That total lack of specificity is fatal to Board's challenge. To adapt what was said in Johnson, 702 F.3d at 372 to this case, the very vagueness

_____

[7] Board likely does not make such an argument because it cannot. Union's and Board's current CBA contains no provision establishing what our Court of Appeals once dubbed "competitive seniority" (Romasanta v. United Air Lines, Inc., 717 F.2d 1140, 1144 (7th Cir. 1983)) -- that is, a kind of zero-sum seniority system where one employee's gain is necessarily another employee's loss. This Court can take judicial notice of the provisions of the current CBA (neither party has submitted a copy of it), for it is incorporated into the public decisions of Board and is part of the public record (Chicago Board of Education 12-1024-EX7 (October 24, 2012); Menominee Indian Tribe of Wis. v. Thompson, 161 F.3d 449, 456 (7th Cir. 1998)).

of the purported conflict that Board has asserted nearly 2-1/2 years into the litigation suggests

strongly that _no_ conflict exists:

> Its contention that some [Union] members will be hurt by class treatment rings
> hollow.  It knows the names of all the [Union] members and could have found
> one -- if there is one -- who if informed of the class action would express concern
> that it might harm him. [Board] either didn't look for such a [Union] member,
> which would be inexcusable, or it looked but didn't find one, which would
> probably mean that there isn't any such [Union] member. . . .  It is premature to
> declare the alleged conflicts of interest an insoluble bar to the class action.

Board does try to give some substance to its challenge to Union's adequacy, but not by

pointing up any actual conflicts of interest.  Instead Board cites two provisions of Union's

constitution and contends that those provisions prohibit Union from acting as class representative

in this litigation.  Plaintiffs respond that the cited passages have no such import.

Here are the passages that Board thinks put Union in violation of its own constitution and

thus make Union incurably conflicted (B. Resp. Mem. 28-29):[8]

> [Section 1.]  This Union shall not promote or permit itself to be used to promote
> any advantage for any member or particular group of its members, unless the
> House of Delegates shall decide by majority vote that such action is in the action
> of the Union as a whole.

*       *       *

> [Section 4.]  The Union shall not make any distinction among its members on
> account of race, ethnicity, sex, sexual preference, age, or political, social,
> religious, or economic views.

Plaintiffs are correct in arguing that neither of those provisions really has anything to do

with the case at bar.  As for Section 1, that passage by its terms applies to "advantage," not

redress for wrongs.  That is an important distinction, because without it Section 1 would forbid

---

[8]  Board did not provide a full copy of Union's constitution, but it states that the quoted
passages are both from Art. XII of that document.

Union from pursuing grievances on behalf of individual workers -- which Union certainly can do.  In this case, just as with grievances, Union is not seeking any "advantage" for African American employees, but rather redress for a wrong that Union says they have suffered (firing as a result of racial discrimination).  So Section 1 has no application here.  And Section 4 is even more obviously inapplicable to the facts.  It simply is a ban on discrimination.  Board nowhere asserts that Union is discriminating against its non-African American members -- for example, by refusing to bring lawsuits on their behalf when they suffer racial discrimination.  And without any evidence whatever of discrimination, Section 4 also plays no adverse role.

In sum, neither Board's assertion of totally vague and indeterminate conflicts nor the provisions of Union's constitution that Board cites do anything at all to suggest a real or even potential conflict of interest that would interfere with Union's representation of the class.  Meanwhile plaintiffs have pointed to actions taken by Union that suggest it has vigorously sought to advance the interests of the class thus far (P. Mem. 23).  This Court also notes that individual plaintiffs now have retained separate counsel (see Dkt. 16), a step that  greatly attenuates any claimed risk that Union would act to hijack this litigation for its own (rather than class members') purposes.  And of course, should real or potential conflicts on Union's part become apparent at a later date, this Court would then be free to decertify Union as a class representative while still permitting the individual plaintiffs to prosecute the action on their own (see Rule 23(c)(1)(C)).  With all that in mind, this Court now finds that Union will also fairly and adequately represent the interests of the class, thus satisfying the requirements of Rule 23(a)(4).

Hence plaintiffs have met all the requirements of Rule 23(a).  But to have their proposed class certified, plaintiffs must also meet the requirements of at least one provision in Rule 23(b).

And in this instance plaintiffs meet the requirements of not one but two such provisions:  Rule 23(b)(2) and Rule 23(b)(3).

**Rule 23(b)(2)**

Rule 23(b)(2) provides that a class may be certified if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Wal-Mart, 131 S. Ct. at 2557 (internal citation and quotation marks omitted, emphasis in original) has explained the Rule:

> [A]t a minimum, claims for <u>individualized</u> relief . . . do not satisfy the Rule. The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted -- the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.  In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant.  Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

But that last sentence does not mean that any case involving money damages is unsuited for certification under Rule 23(b)(2).  While Wal-Mart found individualized awards of backpay improper in a pure Rule 23(b)(2) class action, our Court of Appeals has held that injunctive relief and damages can be sought in separate phases of a single class action -- the court can simply order  a "divided certification" that invokes either Rule 23(b)(2) or 23(b)(3) as to appropriate phases of the trial (see Johnson, 702 F.3d at 371) -- which is precisely what plaintiffs seek here.

As to the requirements of Rule 23(b)(2), plaintiffs contend that Board has acted on grounds that apply generally to the class by selecting their schools for layoffs, thus causing a disparate impact on African American employees.  Plaintiffs also assert that injunctive relief

would affect the class as a whole and would be final.  In particular, plaintiffs ask for two forms of injunctive relief:  an order enjoining Board from applying the policies that guided the 2011 layoffs to any future layoffs that may occur (or an equivalent declaratory judgment) and a reinstatement order so that class members can return to their jobs at CPS (Am. Compl. 17).[9]

Board responds first of all by continuing to misunderstand or misconstrue plaintiffs' theory of relief -- Board says that it did not act on grounds applicable generally to the class because it was individual principals, and not Board itself or a Board-guided central decision maker, who selected class members for layoffs.  As has already been explained, that argument misses the point entirely, and there should be no need to rehash (again) plaintiffs' perfectly straightforward theory of relief based on Board's selection of schools for layoffs rather than principals' selection of positions for layoffs.

But Board makes a second argument that deserves some consideration:  It contends that any injunction would inevitably set in motion a mechanism for determining which individual class members suffered an injury at all and for then determining to what relief they might be entitled -- a process that would necessarily involve questions as to whether individual employees

_____

[9]  This opinion excludes from consideration plaintiffs' further demand for injunctive relief aimed at preventing Board from using the same policies to conduct future layoffs (should any occur).  That is because plaintiffs lack any entitlement to such a remedy.  They constitute teachers and staff who have already been laid off, so that such a prospective order would not redress the injury they have suffered (Arreola v. Godinez, 546 F.3d 788, 799 (7th Cir. 2008)).  Even if plaintiffs were talking about forestalling future injury after they are rehired (assuming they attain that relief), there is no indication that Board will then order more layoffs, so that any such injury is too speculative to support a claim for purely forward-looking equitable relief (see id.).  And finally, issuing a separate injunction (or declaratory judgment) finding Board's policy illegal would be redundant.  Under the facts of this case, any reinstatement order and indeed any successful claim for damages would necessarily involve a finding that Board's policy violated Title VII illegally.  And that would have precisely the same effect as the kind of declaratory judgment or injunction that plaintiffs demand as to Board's continued use of that policy.

had maintained the state certifications that would be necessary for reinstatement, whether such employees had mitigated their damages by obtaining other employment, and so on. Thus, argues Board, an injunction could not provide "final" relief to the class within the meaning of Rule 23(b)(2).

Board's argument boils down to a single complaint: Crafting a reinstatement order would be difficult. But just because an order is complex or involves multiple steps does not mean it fails to provide final relief. Indeed, hiring orders issued on a classwide basis almost always involve multiple steps and the fulfilment of various conditions (see, e.g., the orders discussed in Lewis v. City of Chicago, 702 F.3d 958, 960-61 (7th Cir. 2012) and in Romasanta, 717 F.2d at 1146-47). Board attempts to analogize this action cases such as Jamie S. v. Milwaukee Pub. Sch., 668 F.3d 481, 498-99 (7th Cir. 2012), where our Court of Appeals found that any injunctive relief that could be granted on a classwide basis would not be final. But that case (and the other cases Board cites) dealt with proposed Rule 23(b)(2) classes that were so non-uniform they required wholly separate injunctions as to each class member and individual hearings to determine the basic question of liability. By contrast, a reinstatement order in this action would be a single order that applied to all class members. And of course any such order would be preceded by a class proceeding that determined the question of Board's liability as to all class members at once. Accordingly, certification under Rule 23(b)(2) is proper.

But it would be improper to leave the certification at that, because plaintiffs demand "[t]o be made whole for the damages and financial losses suffered," which encompasses both

compensatory damages and backpay.[10]  As <u>Wal-Mart</u>, 131 S. Ct. at 2557 (emphasis in original) has made explicit, it is improper to certify a class action under Rule 23(b)(2) when plaintiffs make "claims for <u>individualized</u> relief," such as the backpay and compensatory damages demanded here.  So plaintiffs have also sought (as they must) class certification under Rule 23(b)(3).

**Rule 23(b)(3)**

Rule 23(b)(3) provides that a class may be certified if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Courts regularly refer to those two requirements by the shorthand terms "predominance" and "superiority."

Rule 23(b)(3)'s predominance requirement is "far more demanding" than Rule 23(a)'s commonality requirement (<u>Amchem Prods, Inc. v. Windsor</u>, 521 U.S. 591, 623-24 (1997)). While the latter requirement is met by merely showing the existence of a single question common to class members' claims, predominance requires that those common questions "can be resolved for all members of a class in a single adjudication" (<u>Messner</u>, 669 F.3d at 815, quoting 7AA Wright & Miller, <u>Federal Practice & Procedure</u> § 1778 (3d ed. 2011) (internal punctuation marks omitted)).  That means that while individual questions must not outweigh the common ones, "individual questions need not be absent" either (<u>id.</u>).

_____

[10]  Title VII allows for damages beyond backpay in cases where intentional discrimination is found (42 U.S.C. § 1981a(b)(2)).  As noted earlier, plaintiffs do not specifically allege intentional discrimination by Board, but their factual pleadings would support an inference of intentional discrimination -- and of course plaintiffs need not plead legal theories (<u>NAACP v. American Family Mut. Ins. Co.</u>, 978 F.2d 287, 291-93 (7th Cir.1992) and <u>Bartholet v. Reishauer A.G. (Zurich)</u>, 953 F.2d 1073, 1078 (7th Cir. 1992)).

Plaintiffs argue that common questions predominate in this action because one central question -- Board's liability under either a disparate impact or disparate treatment theory -- drives the case. Furthermore, say plaintiffs, although damages will have to be calculated separately for each class member, that will be a relatively straightforward task. Because wage levels are predetermined by the CBA, the precise level of each class member's lost earnings will be easily ascertainable. Then once those earnings are calculated, one need only subtract the sum of each class member's non-CPS income for the relevant time period to determine an appropriate backpay award. And that, plaintiffs assert, means that whatever individual questions might arise as to damages will not predominate over the centrally shared question of liability.

Board's only challenge to certification under Rule 23(b)(3) is its broken-record-type reassertion that individual principals fired plaintiffs, so that common questions do not predominate on that skewed premise. And that means Board has simply failed to raise any substantial challenge at all to plaintiffs' arguments for finding predominance within the meaning of Rule 23(b)(3). Lastly, Board simply omits any challenge at all to plaintiffs' assertion that class treatment is superior to individual adjudications.

This Court finds that certification under Rule 23(b)(3) is warranted because the central issue of liability predominates, significantly outweighing the individual issues in this litigation. Also convincing is plaintiffs' argument that the existence of CBA-set salaries and wages would make any potential damages award (including but not limited to backpay) more likely amenable to class adjudication than not. Indeed <u>Randall</u>, 637 F.3d at 825-26 affirmatively recommended certification under Rule 23(b)(3) in a case where back wages and other damages were far harder to calculate due to an employer's discretion in setting salaries to market rate.

Nor would it be appropriate to deny initial certification under Rule 23(b)(3) because of some amorphous and purely hypothetical possibility that individualized damages determinations might override the common questions at the heart of this action (see Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004)).  If however it were to become clear later in this litigation that genuine issues of fact incapable of classwide resolution will prevent a relatively straightforward calculation of damages, this Court would then be free to order separate proceedings or take other steps to ensure that such individualized issues are addressed appropriately (on that score, see the list of tools available to district courts to account for damages set out in Carnegie, id., as well as the recommendation in Butler v. Sears, Roebuck & Co., 727 F.3d 796, 800 (7th Cir. 2013) for the judicious use of Rule 23(c)(4) to sever damages determinations if they threaten to overwhelm common issues).

**Order of Proceedings**

One final question is the order in which the various stages of this case should proceed. Rule 23(b)(3) of course contains notice and opt-out requirements that are simply inappropriate under Rule 23(b)(2).  And the Seventh Amendment guarantees the right to a trial by jury in civil damages actions, a guaranty undiminished by the joinder of damages claims to demands for injunctive relief as part of a class action (see Johnson, 702 F.3d at 371).  At the same time, the classwide nature of the injury alleged in this case as well as the necessarily uniform nature of the proposed relief (a classwide reinstatement order) would make it infeasible to permit individual class members to opt out.

With all those considerations taken into account, this Court perceives a likely appropriate course of action to be what follows in this paragraph.[11]  First, the issue of liability would be tried to a jury, which would accommodate both the jury demand of plaintiffs (see Am. Compl. ¶ 17) and the requirements of the Seventh Amendment (see <u>Allen v. Int'l Truck & Engine Corp.</u>, 358 F.3d 469, 471-72 (7th Cir. 2004)).  But because liability would be determined on a classwide basis under Rule 23(b)(2) as a prerequisite to injunctive relief, there would be no immediate requirement for elaborate notice at that stage.  After that determination (if Board were to be found liable) the injunctive phase would be tried before this Court -- again under Rule 23(b)(2). Finally, should issues of damages remain, and should they still appear amenable to resolution on a classwide basis, they would be tried to a jury under Rule 23(b)(3).  Only after this Court enters an injunction (or determines that no injunction is warranted) would plaintiffs be required to provide the elaborate notice that Rule 23(b)(3) requires.

## Conclusion

For the foregoing reasons, and pursuant to Rule 23(c)(1)(B), this Court certifies this plaintiff class:

> All African American persons whose employment as a tenured teacher or staff member, as defined by the collective bargaining agreement between the Chicago Teachers Union and the Board of Education of the City of Chicago, was terminated by the Board of Education pursuant to its "layoff policy" in 2011.

That class' common claim is that Board terminated their employment as CPS employees in violation of Title VII by selecting schools for layoffs in such a way that the layoffs created a

---

[11]  Because the parties have not weighed in on that subject, this Court will of course welcome input from the litigants' counsel as to alternative suggestions.  They should come prepared to discuss the matter, or to suggest an early timetable for doing so, at the next status hearing date set at the end of this opinion.

disparate impact on African American employees.[12]  If Board is found liable under either an intentional or disparate impact theory of discrimination, this Court will take up the common question of what injunctive relief is appropriate -- and thereafter any remaining damages claims will either be severed or tried together to a jury following appropriate notice and the opportunity to opt out being given to class members.

Lastly, this Court appoints as class counsel the law firm of Robin Potter & Associates, P.C. and the Mandel Legal Aid Clinic of the University of Chicago.  Finally, all parties are ordered to appear for a status conference at 9:15 a.m. on June 1, 2015.

_____
Milton I. Shadur
Senior United States District Judge

Date:  May 22, 2015

_____

[12]  Implicit in that claim is the question whether Board acted intentionally.  But an affirmative finding in that respect is not a precondition to Board liability.