**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHICAGO TEACHERS UNION, LOCAL 1, AMERICAN FEDERATION OF TEACHERS, AFL-CIO, TERRI FELLS, LILLIAN EDMONDS, and JOSEPHINE HAMILTON PERRY, individually and on behalf of all similarly situated persons, | ) ) ) ) ) ) | Case No. 12 C 10338 |
| | ) ) | Judge Milton I. Shadur<br>Magistrate Judge Susan Cox |
| Plaintiffs, | ) ) | |
| v. | ) ) | JURY TRIAL DEMANDED |
| BOARD OF EDUCATION OF THE CITY OF CHICAGO, a body politic and corporate, | ) ) ) ) | |
| Defendant. | ) | |

## SECOND AMENDED COMPLAINT

Plaintiffs, the Chicago Teachers Union ("CTU"), Terri Fells ("Ms. Fells"), Lillian Edmonds ("Ms. Edmonds") and Josephine Hamilton Perry ("Ms. Perry") (collectively, "Plaintiffs"), by and through their attorneys, Robin Potter & Associates, P.C., and on behalf of themselves and a class of all other similarly situated persons, file this class action complaint against Defendant Board of Education of the City of Chicago ("Board" "BOE" or "Defendant" or "BOE"), as follows.

### SUMMARY OF CLAIM

1.      This is a class action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sec. 2000e *et seq.* ("Title VII"), to redress defendant's pattern and practice of discrimination against a class of African American teachers and para-professionals by terminating their employment pursuant to a layoff policy which has a disparate impact on African Americans.

## PRELIMINARY STATEMENT

2.      The Chicago Public School system, operated by Defendant, is responsible for the administration of approximately 685 schools, servicing over 400,000 students in each of Chicago's 77 neighborhoods.  Approximately 90% of the students educated in CPS's 578 non-charter schools are minorities, of which 42% are African American.

3.      CPS is currently divided up into four (4) networks: Far South, South Side, Southwest Side and West Side.

4.      The African American teaching force in CPS as a percentage of the overall teaching population has steadily declined, from 40.6% in 2000 to 29.6% in 2010.  In 2011, African American teachers constituted approximately 28.7% of the tenured teaching population. Most of CPS's African American teachers are employed in South and West side schools.

5.      This above noted decline in African American teachers corresponds directly with a series of layoffs and school actions conducted by Defendant.  From 2010 through the present, defendant has laid off approximately 2900 teachers and para-professionals.

6.      In Defendant's layoffs process, the Chief Executive Officer ("CEO") of CPS approves the selection of schools from which layoffs will occur.  Principals of the individual schools then select the teachers to be terminated.  However, defendant targets for layoff at a higher rate, South and West side schools where African American teaching and staff populations are highest. Thus, defendant's selection and layoff policies disproportionately affect African American teachers and staff.

7.      In June, 2011, the Board terminated the employment of 931 classroom teachers through a round of layoffs.  480 of these teachers were tenured.  African Americans made up

42% of the tenured teachers terminated, although constituting less than less than 29% of all CPS tenured teachers.

8.      Defendant's pattern and practice of targeting schools with high African American teaching populations for layoff has a disparate impact on African American tenured teachers and staff.

## CLASS DEFINITION

9.      Plaintiffs bring this case as a class action under Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), on behalf of the following class:

> All African American persons employed as a tenured teacher or staff member, as defined by the collective bargaining agreement between the Chicago Teachers Union and the Board of Education of the City of Chicago, who received a layoff notice from the Board of Education pursuant to its "layoff policy" in 2011.

## PARTIES

*Chicago Teachers Union*

10.      Plaintiff CTU is a labor organization within the meaning of Section 2(c) of the Illinois Educational Labor Relations Act, 115 ILCS 5/2(c), representing over 30,000 professional educators and Board of Education employees, the vast majority of the unionized workforce in the Chicago Public Schools. It is the exclusive bargaining representative for all teachers and paraprofessional and School Related Personnel ("PSRP") in CPS.  The CTU brings this action in its associational capacity to assert the constitutional and statutory rights of its members and the class.

***Terri Fells***

11.     Ms. Fells is an African American female who at all relevant times was an "employee" of Defendant within the meaning of Title VII.

12.     Ms. Fells was born in 1953 and is currently 59 years old.

13.     She was employed as a CPS teacher for 28 years until her termination by Defendant in 2011.

14.     Ms. Fells received her Bachelor's Degree in French from the University of Illinois - Chicago in 1978, and her Master's of Science in Curriculum and Assignments from Chicago State University in 1993.  She was also certified by the Illinois State Board of Education ("ISBE") to teach Kindergarten through Eighth grade, early childhood education and French.

15.     Ms. Fells taught at Amos Alonzo Stagg Elementary School as a full-time teacher for 27 years.

16.     Ms. Fells has routinely received Superior or higher evaluations from CPS.

17.     Ms. Fells taught at Amos Alonzo Stagg Elementary School during the 2010-2011 school year.

18.     On or about June, 2011, Ms. Fells was terminated from her employment as a full-time tenured teacher.

***Lillian Edmonds***

19.     Ms. Edmonds is an African American female who at all relevant times, was an "employee" within the meaning of Title VII.

20.     Ms. Edmonds was born in 1949 and is currently 63 years old.

-4-

21. She was employed as a CPS teacher with the Board for 15 years until her termination in 2011.

22. Ms. Edmonds holds a Bachelor's Degree in Elementary Education and is certified to teach Language Arts and Social studies in Kindergarten - Ninth grade.

23. During her 15 year tenure with CPS, Ms. Edmonds taught at Schiller Elementary School (6 years), Langston Hughes Elementary School (6 years) and Henderson Elementary School (3 years).

24. Ms. Edmonds has routinely received Excellent and Superior evaluations.

25. Ms. Edmonds taught at Henderson School during the 2010-2011 school year.

26. On or about June, 2011, Ms. Edmonds was terminated from her employment as a full-time tenured teacher.

*Josephine Hamilton Perry*

27. Ms. Perry is an African American female who at all relevant times was an "employee" within the meaning if Title VII.

28. She was born in 1947 and is currently 65 years old.

29. Ms. Perry was employed as a CPS teacher with the Board for 19 years prior to her termination in 2011.

30. Ms. Perry routinely received Satisfactory or better evaluations from CPS. During the 2010-2011 school year, she was given an "unsatisfactory" rating which caused defendant to "flag" her as one of two teachers with the lowest bumping rights.

31. Ms. Perry taught at Henry O'Tanner Elementary School during the 2010-2011 school year.

32.     On or about June, 2011, Ms. Perry was terminated from her employment as a full-time tenured teacher.

*Defendant*

33.     Defendant Board is a body politic and corporate, organized under the State of Illinois School Code, 105 ILCS 5/34-1. It was at all relevant times an "employer" within the meaning of the Title VII.

34.     Defendant Board is an educational employer within the meaning of Section 2(a) of the Illinois Educational Labor Relations Act, 115 ILCS 5/2(a), is or was the employer of the plaintiffs and the class, and is the entity charged by law with maintaining a free public school system within the City of Chicago. Defendant Board was at all relevant times an "employer" within the meaning of Title VII.

## JURISDICTION, VENUE AND ADMINISTRATIVE REQUIREMENTS

35.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §1331.

36.     Venue is proper in this judicial district as the facts and events giving rise to Plaintiffs' claims occurred in this judicial district and defendant resides or maintain offices within this judicial district.

37.     Plaintiffs timely filed charges with the Equal Employment Opportunity Commission ("EEOC") and timely filed this Complaint within 90 (ninety) days of receipt of their Right to Sue letters from the EEOC.  See Group Exhibit "A."

-6-

## FACTUAL BACKGROUND

38.     Chicago Public Schools employ roughly 23,000 teachers in their 578 schools (excluding charters, non-CPS turnarounds or non-CPS performance schools). As of June 2011, 50.7% of CPS's teachers were Caucasian and 29.6% were African American. African Americans constitute 28.65% of defendant's tenured teaching force.

39.     In schools on the South and West sides of the city, comprising the Far South, South Side, Southwest Side and West Side high school networks or their corresponding elementary networks, African Americans constitute about 35.3% of the tenured teaching population, compared to only 9.3% in North side schools.

40.     Defendant's layoff practices have targeted South and West side schools, resulting in a disproportionately high number of African American tenured teachers being terminated.  In 2011, 42% of the 480 tenured classroom teachers terminated as a result of layoffs were African American, compared to 36.1% Caucasian.

**A.      Recent History of the Layoffs**

41.     In June 2009, CPS announced a $500 billion budget deficit, causing it to layoff employees for economic reasons.

42.     As of June 2009, the Board had in place layoff policy 07-1219-PO1 setting forth the following procedures:

       i.      In schools not subject to school action, teachers with appropriate certifications are to be laid-off by seniority in each of the following categories, in order:

          (1)     Provisionals
          (2)     Day-to-day substitutes
          (3)     Cadre Substitutes
          (4)     Temporarily assigned teachers

     (5)     Probationary Teachers
     (6)     Tenured teachers.

43.     The Board authorized layoffs on June 24, 2009, resulting in the termination of 400 teachers, pursuant to defendant's policy.

44.     In June of 2010, CPS announced that despite the previous year's layoffs, its budget deficit had grown to $600 Million, requiring yet more layoffs.

45.     At a special meeting held on June 15, 2010, Defendant authorized the layoff of 2700 teachers.

46.     The Board adopted a new layoff policy on June 23, 2010, 10-0623-RS32. The policy set forth the following procedures:

     i.     The Chief Executive Officer or his designee shall take performance or evaluation ratings into account at schools experiencing layoffs, by first selecting teachers under remediation or those who received an "unsatisfactory" rating in the most recent year.
     ii.     The Chief Executive Officer or his designee will order any remaining layoffs pursuant to the order set forth in para. 14.

47.     As a result of the 2010 layoffs, about 1118 classroom teachers were terminated, of which 736 were tenured.

48.     About 346 schools were affected by the layoffs, however, only 44 schools were selected to layoff five or more teachers.

49.     The 44 schools most affected by the 2010 layoffs in which the employment of five or more teachers were terminated, are located primarily in the South and West sides of the city.

50.     61% of the schools selected to terminate five or more teachers as a result of the 2011 layoffs are located on the South and West sides of the City.

51.     20 schools terminated five or more tenured teachers in the 2011 layoffs.

52.     60% of the schools that terminated five or more tenured teachers in the 2011 layoffs are located in the South and West sides of the City.

53.     Of the 738 tenured teachers terminated in the 2011 layoffs, 42% were Caucasian and 40 % were African American.

**B.      New Process for 2011 Layoffs**

54.     In June  2011, the Board adopted layoff policy 11-0622-PO1, which reiterated the order set forth in ¶46 above, but only when layoffs occurred as a result of what defendant considered to be a program closure, drop in enrollment, change in educational focus of the school or remedial actions taken against the school.

55.     The layoff policy states that where the CEO chooses to layoff teachers for any reason other than those set forth in the preceding paragraph, the following procedures apply:

      i.      The CEO or his designee will determine the number and type of positions to be eliminated within each school;

      ii.     Teachers will be laid-off, in order of seniority, from the selected schools based on the following order:

          (1)    Teachers with lapsed or inappropriate certifications or credentials

          (2)    Teachers rated unsatisfactory

          (3)    Retired Teachers

          (4)    Temporarily Assigned teachers

          (5)    Probationary Appointed Teachers

          (6)    Appointed Tenured Teachers.

**C.      2011 Layoff Results.**

56.     In June 2011, CPS announced that despite previous mass layoffs, it was in a financial crisis, harboring a debt of $720 million and thus, required more layoffs.

57.    On or about June 2011 the Board authorized the layoff of 931 classroom teachers.

58.    As a result of the 2011 layoffs, 480 tenured classroom teachers were terminated.

59.    About 346 schools were affected by the layoffs, however, only 49 schools were selected to layoff five or more teachers.

60.    The 49 schools most affected by the 2011 layoffs, those forced to terminate the employment of five or more teachers, are located primarily in the South and West sides of the city.

61.    71% of the schools selected to terminate five or more teachers as a result of the 2011 layoffs are located on the South and West sides of the City.

62.    19 schools terminated five or more tenured teachers as a result of the 2011 layoffs.

63.    78.9% of the schools that terminated five or more tenured teachers as result of the 2011 layoffs are located in the South and West sides of the City.

64.    Of the 480 tenured teachers terminated, 37.92% were Caucasian and 42.08% were African American.

## STATEMENT OF THE CLAIM

**A.    The Board's Layoff Policy and Practice has a Discriminatory Racial Impact**

65.    Defendant's layoff policy negatively impacts African American tenured teachers and para-professional staff.

66.    Defendant employs roughly 23,000 teachers, over 16,500 of whom are tenured.

67.    Approximately 47% of all tenured teachers employed by the Board are Caucasian.

68.    Approximately 29% of all tenured teachers employed by the Board are African-

American.

69.     Approximately 24% of all tenured teachers employed by the Board are non-African American minorities

70.     While African Americans make up approximately 28.65% of the tenured teachers in all of CPS, they accounted for approximately 35.3% of tenured teachers in South and West side schools as of June 2011.

71.     202 of the 480 tenured classroom teachers terminated as a result of the 2011 layoff policy, or roughly 42%, were African American.

**B.     The Layoff Practice Employed By the Board is Neither Job-Related nor Consistent with Business Necessity**

72.     CPS's layoffs target schools with disproportionately high African American teaching populations.  Business necessity does not justify imposing a greater layoff burden on teachers and staff who are African American. Further, the procedures published by the Board do not provide teachers with notice as to what criteria will be used to select schools to be targeted by layoffs.

**1.     The layoff selection process is ambiguous and discriminatory**

73.     While CPS published layoff procedures prior to the 2011 layoffs, the selection process of affected schools is secretive.

74.     CPS has argued that layoffs occur in large part as a result of drop in student enrollment and budget shortfalls.

75.     Budget shortfalls affect the Chicago Public School system in the aggregate and should not result in African American tenured teachers being laid-off at a disproportionate rate to their overall presence within CPS.

-11-

76.     Drops in student enrollment are equally unreliable in predicting layoffs implemented by the Board.

77.     For instance, George Manierre Elementary School had a drop in student enrollment of 14% from 2010-2011 to 2011-2012, a larger drop in enrollment than that experienced by more than 30 South or West side schools forced to terminate five or more teachers.

78.     Manierre is located in the Fullerton Elementary network, on the North side of the city.

79.     In sharp contrast, Hyde Park Career Academy, located on the South side of the city, saw a drop in student enrollment of 5% from 2010-2011 to 2011-2012, but was forced to terminate 10 teachers.

80.     Joseph Lovett elementary school, located in the Austin-North Lawndale elementary network, actually saw a 4% increase in student enrollment, yet was selected to terminate five teachers.

81.     At least seven schools located on the North side of the city experienced a larger drop in student enrollment than the most affected by the 2011 layoffs  were not affected at all by the 2011 layoffs.

### 2.     Layoffs Are Not Related to Cost-Saving Objectives

82.     The Board has routinely characterized its layoffs as meant to achieve cost-savings in an effort to decrease its budget shortfalls.

83.     Selection of South and West side schools for layoffs does not result in any more cost-savings over and above the selection of North side schools that employ a significantly

higher number of Caucasian teachers.

### 3. Layoffs Were Not Conducted Exclusively at the Local Level

84.   The Board claims that layoff decisions were made at the local level, by principals of the selected schools, without oversight by CPS.

85.   The Board's layoff policy explicitly states that the CEO of CPS is responsible for selecting schools to be affected by layoffs.

86.   In selecting schools to be affected by layoffs in 2011, CEO Brizard targeted South and West side schools, which employ a larger percentage of African American teachers than CPS overall.

87.   Even if principals at the targeted schools made the ultimate decisions as to which individuals to select for layoff, the higher percentage of African American tenured teachers employed in the selected schools had a disparate impact on African American teachers and para-professionals terminated as a result of the layoffs.

88.   While principals may have selected individual teachers to be laid-off, "[t]he right to employ, discharge, and layoff shall be vested exclusively with the board." 105 ILCS 5/34-8.1.

89.   The Board failed to exercise its authority to reduce the disproportionate impact the layoffs had on African American tenured teachers.

### 4. Defendant failed to conduct any assessment of the impact of the layoffs on African American tenured teachers prior to authorizing them.

90.   Defendant failed to consider "race, gender or age" in all cases regarding the layoffs of classroom teachers.

91.     Because Defendant is ultimately the only party authorized to conduct layoffs, despite the recommendations of principals, it is their obligation to conduct an assessment of the effect layoffs will have on African American teachers.

C.      **There is a Less Discriminatory Alternative than to Impose Adverse Impact on Minority Teachers and Para-Professionals**

92.     Defendant's layoff policies and practices result in the disproportionate termination of African American teachers and staff

93.     Less discriminatory alternatives exist rather than to implement defendant's layoff policy, including publication of the specific criteria used to select the schools to be affected by layoff, in order to provide notice to teachers on how their schools are being assessed by the Board.

## CLASS ACTION ALLEGATIONS

94.     Plaintiffs are members of the Class, which includes all African American tenured classroom teachers and para-professionals employed by the Board during the 2010-2011 school year and terminated as a result of layoffs during the 2011 calendar year or who may be subjected to the Board's policies or practices in the future.

95.     The members of the Class are so numerous that joinder of all of them is impracticable.  Roughly 480 tenured classroom teachers were terminated as a result of the layoffs and 202 of these teachers were African American.

96.     There are questions of law and fact common to the Class, and these questions predominate over any questions affecting only individual members.  Common questions include, without limitation:

-14-

    (1)     Whether it is Defendant's policy or practice to target schools in specific geographic regions for layoff,

    (2)     Whether Defendant's policy or practice to select schools for layoff in specific geographic regions has a disparate impact on the employment of African American tenured teachers,

    (3)     Whether Defendant's policy or practice to select schools for layoff in specific geographic regions is job related and consistent with business necessity,

    (4)     Whether less discriminatory policies exist that would meet Defendant's legitimate business needs; and

    (5)     What equitable, declaratory and injunctive relief is warranted.

97.    Plaintiffs' claims are typical of the claims of the Class: (1) Each of the Plaintiffs was terminated as a result of Defendant's action to layoff teachers during the 2011 calendar year; (2) Each was terminated from his or her position as a tenured teacher; (3) Each was sent substantially the same form letter notifying them of their rights upon displacement; (4) Each has the same discrimination claims based on disparate impact.

98.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have no conflict with another or any class member. Plaintiffs are committed to the goal of having the Board revise or abolish its layoff practices to reduce or eliminate the disparate impact it has on African American tenured teachers.

99.    Plaintiffs have retained counsel competent and experienced in complex class actions, employment discrimination litigation, and the intersection thereof.

100.    Class Certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) because Defendant has acted and/or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to Plaintiffs and the Class as a whole.

## COUNT I

### Title VII - Race Discrimination - Disparate Impact

101.    Plaintiffs restate and reallege paragraphs 1- 100 as if fully set forth herein.

102.    Plaintiffs bring this claim on behalf and of themselves and similarly situated Class members.

103.    Defendant's policy and practice of targeting South and West side schools for layoffs resulting in the termination of hundreds of teachers has a disparate impact on African Americans and is neither job related nor consistent with business necessity.  Even if Defendant's policy and practice of terminating teachers pursuant to layoff could be justified by business necessity, less discriminatory alternatives exist.

104.    Plaintiffs and the Class have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and the injunctive relief sought in this action is the only means of securing complete and adequate relief.

105.    Defendant's conduct has caused, and continues to cause, Plaintiffs and the members of the Class substantial losses in earnings and other employment benefits.

## COUNT II

### Title VII - Race Discrimination - Disparate Treatment

106.    Plaintiffs restate and reallege paragraphs 1-105 as if fully set forth herein.

107.    Plaintiffs bring this claim on behalf and of themselves and similarly situated Class members.

108.    Defendants intentionally subjected Plaintiffs and the class of similarly situated employees who received layoff notices in the summer of 2011 to unequal and discriminatory treatment based on their race (African-American).

109.    Defendant's actions were willful and in violation of Title VII.

110.    Defendant's intentional discrimination against Plaintiffs have caused Plaintiffs lost wages and benefits, pecuniary losses, and other consequential damages.

111.    The named Plaintiffs and members of the Class have been equally affected by Defendant's decision, policy, and plan to layoff teachers and staff in summer 2011.

**WHEREFORE,** Plaintiffs pray this court enter judgment on their behalf and against Defendant for damages including, but not limited to:

A.    Certification of the case as a class action on behalf of the proposed Class;
B.    Declare that the acts and conduct of defendant violate Title VII;
C.    An order reinstating Plaintiffs and Class members to their positions or substantially equivalent positions, or in lieu of reinstatement, front pay and benefits;
D.    To be made whole for the damages and financial losses suffered;
E.    Attorneys' fees and all costs and expenses of suit pursuant to 42 U.S.C. §1981a and 1988; and
F.    Such other and further relief as this Court deems appropriate and just.


## JURY DEMAND

Plaintiffs hereby respectfully demand a jury trial.

-17-

Respectfully submitted,

POTTER BOLANOS LLC

/s/ Robin Potter
One of Plaintiffs' Attorneys

Robin Potter, Esq.
Patrick Cowlin, Esq.
Potter Bolanos LLC
111 E. Wacker Dr., Suite 2600
Chicago, IL 60601
(312) 861-1800
robin@potterlaw.org
patrick@potterlaw.org

Randall D. Schmidt, Esq.
Edwin F. Mandel Legal Aid Clinic
University of Chicago Law School
Attorney for the Individual Plaintiffs
6020 S. University Ave.
Chicago, IL 60637
randall_schmidt@law.uchicago.edu