**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHICAGO TEACHERS UNION, LOCAL 1, AMERICAN FEDERATION OF TEACHERS, AFL-CIO, TERRI FELLS, LILLIAN EDMONDS, and JOSEPHINE HAMILTON PERRY, individually and on behalf of all similarly situated persons, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | No. 12 C 10338 |
| v. | ) ) | Judge Jorge L. Alonso |
| BOARD OF EDUCATION OF THE CITY OF CHICAGO, | ) ) ) | |
| Defendant. | ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs, the Chicago Teachers Union, Local 1, American Federation of Teachers, AFL-CIO ("CTU"), Terri Fells, Lillian Edmonds, and Josephine Hamilton Perry, bring this class-action suit against defendant, the Board of Education of the City of Chicago ("the Board"), asserting claims of racial discrimination under Title VII of the Civil Rights Acts of 1964 and the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e *et seq.* The parties have filed cross-motions for summary judgment, as well as *Daubert* motions to exclude the other's expert testimony. For the following reasons, defendant's motion is granted, plaintiffs' motion is denied, and the *Daubert* motions are denied as moot.

## <u>BACKGROUND</u>

Defendant, the Board of Education of the City of Chicago ("the Board"), is the employer of all teachers and paraprofessionals in the Chicago Public Schools ("CPS") system. (Pls.' LR 56.1 Resp. ¶ 8, ECF No. 249.) Plaintiff CTU is a labor organization and the exclusive bargaining

representative of all CPS teachers and paraprofessionals. (*Id.* ¶ 3.) The individual plaintiffs, Terri Fells, Lillian Edmonds, and Josephine Hamilton Perry, are African-Americans who were working as teachers in CPS schools when they received layoff notices in the summer of 2011. (*Id.* ¶ 5-7.) Plaintiffs bring this suit on behalf of all African-American teachers and paraprofessionals who received similar layoff notices in 2011. (2d Am. Compl. ¶¶ 9, 94-96, ECF No. 167-1; *see* Apr. 28, 2017 Mem. Op. & Order, ECF No. 165 (defining class).)

The Board, via CPS administrators, determines how many teachers to employ in its individual schools based essentially on enrollment projections. (Def.'s LR 56.1 Resp. ¶¶ 1-2, ECF No. 258.) Each spring, a certain number of "quota positions" are allocated to each school based on the school's enrollment projections for the following school year. (*Id.* ¶ 4; Pls.' LR 56.1 Resp. ¶¶ 20, 23.) Additionally, a certain number of "instructional and programmatic positions," such as, for example, special education or bilingual education positions, are allocated to each school based on formulas created by the Illinois State Board of Education, which depend on the number of students in each school needing special education, bilingual education, or other such additional support. (Def.'s LR 56.1 Resp. ¶ 4; Pls.' LR 56.1 Resp. ¶ 25.) Further, each school is allocated a certain amount of discretionary funding derived from federal programs, based on the number of students receiving free or reduced lunch in the school. (Def.'s LR 56.1 Resp. ¶ 4; Pls.' LR 56.1 Resp. ¶ 26.) The school's principal can use this funding to create additional positions, or for any other purpose, at his or her discretion. (Def.'s LR 56.1 Resp. ¶ 4; Pls.' LR 56.1 Resp. ¶ 34.)

Toward the end of each school year, each CPS principal receives a packet of information from the CPS budget office, including a letter providing the number of quota positions and amount of discretionary funding the school has been allocated for the coming school year. (Pls.' LR 56.1 Resp. ¶ 32.) If the school is allocated fewer positions and/or less discretionary funding than in

prior years, the principal may be forced to close positions. Depending on factors such as past performance and applicable seniority rules, the principal makes an initial determination as to which individuals will be retained for the upcoming year and which will be bumped from their positions. (*Id.* ¶¶ 35-36.) The Board's Workforce Planning Department reviews the principal's initial decisions in order to ensure that they comply with the collective bargaining agreement between the Board and CTU. (*Id.* ¶ 37.)

In the spring of 2011, due to a range of factors, the Board was facing a budget deficit of $724 million, and the Board's senior administrators held several meetings to determine how to address it. (*Id.* ¶¶ 10-14.) Among the options presented was altering the formula for calculating quota positions so as to require schools to make do with fewer teachers, but chief executive officer Jean-Claude Brizard rejected this suggestion, which would have increased class sizes. (*Id.* ¶ 14.)[1] In 2011, CPS followed the same process it had followed the previous year for adjusting the number of positions and amount of funding allocated to particular schools. (*Id.* ¶ 31.) As a result, in the summer of 2011, the Board sent 1,470 layoff notices to 1,077 teachers and 393 paraprofessionals. (*Id.* ¶ 38.)

Between 2001 and 2011, enrollment in CPS schools had declined by 7.6%. (*Id.* ¶ 17.) For African-American students, who were in large part clustered on Chicago's South and West Sides, the rate of decline was more than triple, 25.2%. (*Id.*) Of the 1,470 individuals who received layoff notices in 2011, 630 were African-American. (*Id.* ¶ 38). Many of these 630 worked in predominantly African-American schools on the South and West Sides, where enrollment was declining most precipitously. (*See* Def.'s LR 56.1 Resp. ¶ 30.)

Laid-off individuals received full pay and benefits through August 31, 2011. (Pls.' LR 56.1

---

[1] Plaintiffs purport to dispute this fact as based on hearsay, but defendant cites testimony of administrators who were present for these meetings, so the hearsay objection is overruled.

Resp. ¶ 39.)  Some tenured teachers were transferred to the Reassigned Teachers Pool, where they received full salary and benefits for ten months while working as substitute teachers.  (*Id.* ¶ 40.) Other tenured teachers were not transferred to the reassigned teachers' pool, but they were given the opportunity to continue their employment as day-to-day substitute teachers, albeit at lower pay, with no guarantee of steady work.  (*Id.* ¶ 42; *see* Def.'s LR 56.1 Resp. ¶ 15.)  Of the 630 laid-off individuals, 335 had found other full-time positions with the Board by September 1, 2011, sometimes in the same school where they had previously worked, and therefore suffered no loss of pay or benefits.  (Pls.' LR 56.1 Resp. ¶¶ 44-46.)  Another thirty-four voluntarily retired prior to September 1, 2011.  (*Id.* ¶ 46.)

## ANALYSIS

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Wackett v. City of Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011).  A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court may not weigh conflicting evidence or make credibility determinations, but the party opposing summary judgment must point to competent evidence that would be admissible at trial to demonstrate a genuine dispute of material fact.  *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009); *see Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013) (court must enter summary judgment against a party who "'does not come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question'") (quoting *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)).  The Court construes all evidence and draws all reasonable inferences in the

light most favorable to the nonmoving party. *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court applies these "ordinary standards for summary judgment" in the same way whether one or both parties move for summary judgment; when the parties file cross-motions, the Court treats each motion individually, "constru[ing] all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017); *see Reeder v. Carter*, 339 F. Supp. 3d 860, 869-70 (S.D. Ind. 2018).

Title VII makes it "an unlawful employment practice for an employer—(1) to . . . discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Unlawful employment practices under this section are of two types: (1) "intentional discrimination (known as 'disparate treatment')" and (2) "practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). Under a disparate treatment theory, "'the most easily understood type of discrimination,'" *id.* (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977)), the plaintiff must prove "that an employer had a discriminatory motive for taking a job-related action." *Ernst v. City of Chi.*, 837 F.3d 788, 794 (7th Cir. 2016). Under a disparate impact theory, by contrast, an employer may be liable for "facially neutral practices that, in fact, are 'discriminatory in operation,'" regardless of intent. *Ricci*, 557 U.S. at 577-78 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)).

Plaintiffs claim that defendant's 2011 layoffs violated Title VII under both disparate impact and disparate treatment theories.  The Court will take each theory in turn.

## I.     DISPARATE IMPACT

On their disparate impact claim, plaintiffs initially bear the burden of making out a *prima facie* case of discrimination by showing that the "tests in question select [employees for layoff] in a racial pattern significantly different from that of the pool" of employees generally.  *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975).  To meet this burden, plaintiffs must identify a specific employment practice and show that it causes "'observed statistical disparities,'" *i.e.*, introduce "'statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of [employees] because of their membership in a protected group.'"  *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 717 (7th Cir. 2012) (quoting *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 994 (1988)); *see Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014) ("Disparate-impact plaintiffs are permitted to rely on a variety of statistical methods and comparisons to support their claims.").  If plaintiffs succeed in establishing a *prima facie* case, then the burden shifts to defendant "to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity."  42 U.S.C. § 2000e-2(k)(1)(A)(i); *see Griggs*, 401 U.S. at 432 ("Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question.")  If defendant satisfies this requirement, then "the burden shifts back to the plaintiff to show that an equally valid and less discriminatory practice was available that the employer refused to use." *Puffer*, 675 F.3d at 717; *see* 42 U.S.C. § 2000e-2(k)(1)(A)(ii), (C).

### A.  Prima Facie Case

To meet their burden of stating a *prima facie* case, plaintiffs have proffered the expert

testimony of Dr. Jonathan Walker, who finds that a disproportionate number of African-American teachers and paraprofessionals, as compared with teachers and paraprofessionals of other racial groups, received layoff notices in 2011, and the disparity cannot be explained by chance.

The Board has proffered its own expert, Dr. David Blanchflower, who finds that most of the 630 class members, despite receiving layoff notices in 2011, did not ultimately suffer an adverse employment action because they voluntarily retired or found new positions in CPS schools (sometimes the very same school) before their pay or benefits changed. When considering only those class members who lost pay or benefits after receiving a layoff notice, Dr. Blanchflower found, "the African American variable is statistically insignificant." (Pls.' LR 56.1 Resp. ¶ 49.)

Each side has moved to exclude the other's expert testimony under Federal Rule of Evidence 702, arguing that the other's expert is unable to assist the trier of fact because he uses the wrong number of injured class members to assess whether the layoff had a disparate impact on African-American teachers and paraprofessionals. Further, the Board argues that, because Dr. Walker's testimony is inadmissible, plaintiffs do not state a *prima facie* case of employment discrimination.

In support of its arguments, the Board argues that the layoff notice itself did not have a sufficiently concrete impact on the terms and conditions of the class members' employment to rise to the level of an adverse employment action that falls within the scope of Title VII's prohibitions. In fact, the layoff notice, *per se*, did not interrupt any class member's pay or benefits, and more than half of the class members never experienced any interruption or reduction in pay or benefits.

As the Seventh Circuit has explained, "not everything that makes an employee unhappy is an actionable adverse action." *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (citing *O'Neal v. City of Chi.*, 392 F.3d 909, 911 (7th Cir. 2004)). An adverse employment

action is typically "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Lewis v. City of Chi.*, 496 F.3d 645, 653 (7th Cir. 2007).  To be actionable under Title VII, an adverse employment action must "materially alter the terms or conditions of employment," *Porter v. City of Chi.*, 700 F.3d 944, 954 (7th Cir. 2012), and it must be "more disruptive than a mere inconvenience or an alteration of job responsibilities," *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1120 (7th Cir. 2009) (citing *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir. 1993)).  For example, "'a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance'" and that involves "'no reduction in pay and no more than a minor change in working conditions,'" does not subject the employer to liability under Title VII.  *O'Neal*, 392 F.3d at 911-12 (quoting *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002)).

More to the point, defendant argues that, under *Ajayi v. Aramark Business Services*, 336 F.3d 520, 524-26 (7th Cir. 2003), a notice of a particular employment action does not trigger Title VII liability if the employment action is never implemented.  In *Ajayi*, the plaintiff received "a memorandum stating that her position was being eliminated and that she would be demoted two weeks later," but she was never actually demoted.  *Id.* at 531.  The Seventh Circuit held that there was no adverse employment action, explaining that "[a]n unfulfilled threat, which results in no material harm, is not materially adverse."  *Id.*  According to defendant, this case is no different for those class members who found employment in CPS schools before September 1, 2011; they suffered no more than a "threat" of "material harm" that never actually occurred.  Because they suffered no material harm, the argument goes, they should not be counted with the other class members in the disparate impact analysis.

Plaintiffs respond that the reasoning of *Ajayi* does not apply here, in the context of a discriminatory layoff, because, ordinarily, a "wrongful-discharge claim accrues—and the limitations period begins to run—when the employer notifies the employee he is fired, not on the last day of his employment." *See Green v. Brennan*, 136 S. Ct. 1769, 1782 (2016) (citing *Delaware State Coll. v. Ricks*, 449 U.S. 250, 258-59 (1980) (where college instructor learned of denial of tenure and was simultaneously given a one-year terminal contract, claim accrued when he was informed of denial of tenure, not when the one-year contract expired) and *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981) (citing *Ricks*)).  By defendant's logic, an employee who receives a layoff notice pursuant to a discriminatory process has no claim unless and until he experiences some "material harm," which may or may not be visited upon him—but that is inconsistent with the Supreme Court's admonition that, in determining when a claim accrues, the "'proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts bec[o]me most painful.'"  *Ricks*, 449 U.S. at 458 (quoting *Abramson v. Univ. of Hawaii*, 594 F.2d 202, 209 (9th Cir. 1979)).  According to plaintiffs, if an employee is notified of impending termination, then the matter of whether the termination is actually carried out is a matter of the employee's damages; it does not affect whether he has suffered an adverse employment action.

Defendant replies that *Ricks* and like cases are distinguishable because they address when a claim accrues for statute of limitations purposes, not whether there has been an adverse action sufficient to incur Title VII liability.  But at least two federal appellate courts have found the *Ricks* line of cases persuasive in the adverse action context.  In *Shultz v. Congregation Shearith Israel of City of New York*, the Second Circuit, relying on *Ricks*, *Chardon*, and *Green*, held that a notice of termination may be an adverse employment action, even where the termination decision is rescinded before it is put into effect:

The Supreme Court's conclusion that a discrimination claim accrues upon notice of termination, rather than upon the implementation of that decision, necessarily implies that the notification of termination qualifies as an adverse employment action. The Supreme Court has not directly addressed whether a rescinded termination constitutes an adverse employment action. But the conclusion that the notice of termination itself gives rise to a claim follows ineluctably from the Court's rulings regarding the limitations period, because a limitations period ordinarily commences when the plaintiff has a complete and present cause of action.

If the claim accrues at the time of notification of termination, however, rescission of the notice at a point after the cause of action has accrued cannot eliminate the adverse employment action that has already occurred, and negate an accrued claim for relief. Accordingly, we conclude that the notice of termination itself constitutes an adverse employment action, even when the employer later rescinds the termination.

867 F.3d 298, 305-06 (2d Cir. 2017) (internal quotation marks and citation omitted). The Second Circuit explained that the employer's decision to rescind the termination can "come into play in connection with the calculation of damages," but it cannot nullify a claim that has already accrued. *Id.* at 306. The court recognized that its ruling was "based on the facts of [the] case," in which an employee received a notice of termination that was rescinded two weeks later, but that its decision might be different in other circumstances. For example, the court recognized that termination, *i.e.*, "complete termination of the employment relationship," is different from other types of adverse employment actions. *Id.* at 307 (distinguishing termination from, for example, disciplinary counseling). A terminated employee naturally "experience[s] the dislocation of losing her employment" and is forced to assess and undertake measures to recoup the loss, which, "even under the most optimal circumstances . . . is likely to give rise to bad feelings and anxiety." *Id.* (internal quotation marks omitted).

In *Singletary v. Howard University*, the D.C. Circuit agreed, holding that "the mere *notice* of termination is a cognizable adverse employment action regardless of whether the employer follows through" because "wrongful discharge claims accrue . . . at the time the employer notifies

the employee that she is fired, not later on the last day of her employment." 939 F.3d 287, 300 (D.C. Cir. 2019) (citing *Schultz*, 867 F.3d at 305-06, *Green*, 136 S. Ct. at 1782, and *Almond v. Unified Sch. Dist. No. 501*, 665 F.3d 1174, 1177 (10 Cir. 2011) (Gorsuch, J.) (listing "notice of termination with a grace period before actual firing occurs" as an "adverse employment action").

In light of these decisions, the Court is inclined to agree with plaintiffs that the layoff notices plaintiffs received were adverse employment actions in their own right, even if many class members never actually experienced an interruption of pay or benefits. Regardless of the fact that many class members found other positions during a short grace period, the fact remains that their positions were closed and the onus was on them to secure new ones. Thus, they fully experienced the "dislocation of losing . . . employment" and necessity of taking action to recoup the loss that the plaintiff in *Schultz* experienced—unlike the plaintiff in *Ajayi*, who received only a notice of demotion that was never imposed, *cf. Nagle*, 554 F.3d at 1120-21 (no adverse action where plaintiff received notice of suspension that was never imposed). In this case, unlike *Ajayi*, there is no question that the layoff *was* imposed, and the fact that some class members managed to find new positions quite quickly merely mitigates their damages; it does not nullify the adverse action.

Ultimately, however, the Court need not rule definitively on this question or on the admissibility of the parties' expert testimony. As the Court will explain more fully below, even if it assumes that plaintiffs are correct and that the Court should admit Dr. Walker's testimony and exclude Dr. Blanchflower's, plaintiffs cannot prevail because they lack sufficient evidence to rebut defendants' business justification for the layoff.

## B. Business Necessity Defense

In *Griggs*, the case in which the Supreme Court first recognized the disparate impact theory for Title VII discrimination claims, the Court described the contours of a disparate impact claim

as follows:

> [Title VII] proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. ***The touchstone is business necessity***. ***If an employment practice which operates to exclude [members of protected classes] cannot be shown to be related to job performance, the practice is prohibited***. . . . Congress has placed on the employer the burden of showing that ***any given requirement must have a manifest relationship to the employment in question***.

401 U.S. at 431-32.

In the Civil Rights Act of 1991, Congress amended Title VII to require employers to "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity," *see* 42 U.S.C. § 2000e-2(k)(1)(A)(i). Among Congress's stated purposes was to "codify the concepts of 'business necessity' and 'job related' enunciated by the Supreme Court in [*Griggs*] and in the other Supreme Court decisions prior to *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989)." Pub. L. No. 102-166, § 3, 105 Stat. 1071 (1991) (italics added). *Wards Cove* had not specifically mentioned either concept in describing the inquiry to be made at the "justification stage" of a disparate impact case, *see Wards Cove*, 490 U.S. at 659, so Congress overruled that portion of the decision in the 1991 Civil Rights Act.

Among the "Supreme Court decisions prior to" *Wards Cove* that applied *Griggs*'s "concepts of 'business necessity' and 'job related[ness]'" was *Dothard v. Rawlinson*, in which the Court stated that, because "the touchstone is business necessity," *Griggs*, 401 U.S. at 431, "a discriminatory employment practice must be shown to be necessary to safe and efficient job performance to survive a Title VII challenge." 433 U.S. 321, 331 n.14 (1977). Later, in *New York City Transit Auth. v. Beazer*, the Court held that the employer's rule excluding all methadone users from employment, even in "nonsafety-sensitive positions," passed muster under the rule of *Griggs* because it bore a "'manifest relationship to the employment in question'" to the extent it "significantly served" the "legitimate employment goals of safety and efficiency," even if those

goals did not absolutely "require" exclusion of applicants who could not pass the drug test. 440 U.S. 568, 587 n.31 (1979) (quoting *Griggs*, 401 U.S. at 432).

As one leading commentator has put it, the 1991 Civil Rights Act's reversion to the law as it existed in these pre-*Wards Cove* cases may simply mean a return to a preexisting "state of confusion." 2 *Larson on Employment Discrimination* § 23.04 (2019). Even before *Wards Cove*, it was unclear how the concepts of job relatedness and business necessity related to one another, but the Seventh Circuit took them together to impose what was essentially a reasonableness requirement, satisfied by less than absolute necessity:

> The district court held . . . that a high school education is an appropriate credential to require of a Cook County corrections officer; and if the court could properly find . . . that such a credential "bear[s] a demonstrable relationship to successful performance" of such a job, or, what we take to be the equivalent, "fulfill[s] a genuine business need," then we must affirm. *Griggs*, 401 U.S. at 431-32. **But what exactly is the standard that we are to apply to this question?** The key words in the passages we have quoted from the *Griggs* case, "need" and "demonstrable relationship to successful performance," are not synonyms; and, surprisingly, the later cases do not converge on a definite and clear standard. . . . **One popular formulation—"essential to safe and efficient" conduct of the employer's business**, which originated in the Supreme Court's decision in *Dothard v. Rawlinson,* 433 U.S. 321, 331 n.14 (1977)—seems very stringent indeed, but is not. It would be if it just said "essential" to the employer's business or "essential to safe" conduct of the business; but "essential to . . . efficient" is just another way of saying "efficient," which **is pretty much the same thing as "reasonable."** In any event, actions speak louder than words; and . . . **the cases support a tolerant standard** for requirements such as the one in issue here. Our circuit has been content to require "a reasonably tight fit between the challenged criterion and the actual demands of the job," *Caviale v. Wis. Dept. of Health & Social Servs.,* 744 F.2d 1289, 1294 (7th Cir. 1984), and we reaffirm this formulation.

*Aguilera v. Cook Cty. Police & Corr. Merit Bd.*, 760 F.2d 844, 846-47 (7th Cir. 1985) (Posner, J.) (internal citations altered) (emphasis added). Following the 1991 Civil Rights Act, the Seventh Circuit again boiled the test down to one of reasonableness:

> [I]f a facially neutral employment practice has a significant discriminatory impact, the employer bears the burden of demonstrating that any requirement of employment imposed has a manifest relationship to the particular

employment. *Griggs* makes clear, however, that even employment tests with a disparate impact are acceptable if "they are demonstrably a reasonable measure of job performance." *Griggs*, 401 U.S. at 436. It would be unrealistic to require more than a reasonable measure of job performance. ***It therefore is a matter of reasonableness***.

*Bryant v. City of Chi.*, 200 F.3d 1092, 1098-99 (7th Cir. 2000) (internal citation altered) (emphasis added).

This case law and its tests do not map neatly or easily onto the facts of this case, as all of these cases were decided in the context of allegedly discriminatory tests or credentialing requirements for *hiring*, not an allegedly discriminatory test for whom to *let go* in a reduction in force. The Supreme Court provided some additional guidance by addressing a similar issue, outside the context of a failure-to-hire disparate impact claim, in *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2518 (2015), in which it considered whether to recognize disparate impact claims under the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq*. The Court concluded that disparate impact claims are cognizable under the Fair Housing Act, relying in large part on *Griggs*, and it explained that they must be "limited" as follows:

[*Griggs* and like] cases also teach that disparate-impact liability must be limited so ***employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system***. And before rejecting a business justification—or, in the case of a governmental entity, an analogous public interest—a court must determine that a plaintiff has shown that there is "an available alternative . . . practice that has less disparate impact and serves the [entity's] legitimate needs." *Ricci,* 577 U.S. at 578.

*Id.* at 2518 (internal citation altered) (emphasis added).

Thus, under the Supreme Court and Seventh Circuit's case law, to determine whether defendant's enrollment-based layoff practice is "job related and consistent with business necessity," this Court considers whether the practice bears a manifest relationship to the

employment in question, whether it is necessary to safe and efficient job performance or essential to safe and efficient conduct of the employer's business, and whether it is consistent with genuine business needs. *See Griggs*, 401 U.S. at 431-32, 436; *Beazer*, 440 U.S. at 587; *Aguilera*, 760 F.2d at 846-47 (citing *Griggs* and *Dothard*, 433 U.S. at 331 n.14); *Bryant*, 200 F.3d at 1098-99. In answering these overlapping questions, the Court does not consider whether the practice is absolutely necessary to the functioning of CPS or its constituent schools or whether it is based on the most essential measures of the class members' and their colleagues' performance of their jobs; it focuses on whether there is a "reasonably tight fit between the challenged criterion and the actual demands of the job," *Aguilera*, 760 F.2d at 847 (internal quotation marks omitted), such that the criterion reflects a reasonable and "practical business choice," *see Texas Dep't of Hous.*, 135 S. Ct. at 2518.

Under these standards, defendant meets its burden of showing that its enrollment-based layoff practice is job related and consistent with business necessity. It is reasonable to devise a system for staffing individual schools with teachers and paraprofessionals based on how many students are enrolled in each school; it goes without saying that the more students there are in a school, the more teachers will be required to educate them efficiently and effectively. Correspondingly, when the number of students in the school drops, one would expect the school's administrators to make the "practical business choice," *Texas Dep't of Hous.*, 135 S. Ct. at 2518, to staff the school with fewer teachers. Such a practice is both "necessary . . . to efficient job performance" and "'essential to . . . efficient' conduct of the employer's business," *see Aguilera*, 760 F.2d at 846-47 (citing *Dothard*, 433 U.S. at 331 n.14), because it ensures that the employer is using its resources (in this case, limited public resources) responsibly to employ only as many teachers and paraprofessionals as it legitimately needs in each school. *See Abril-Rivera v. Johnson*,

15

806 F.3d 599, 606-08 (1st Cir. 2015) (employer met its burden of proving legitimate business justification for closing a facility and laying off its employees where the facility was "no longer needed, given declining [business] needs," and the employer "legitimate[ly]" had "concerns about the costs associated" with maintaining the facility and retaining employees working there)[2]; *Shollenbarger v. Planes Moving & Storage*, 297 F. App'x 483, 486 (6th Cir. 2008) (employer demonstrated "legitimate business justification" for "challenged employment practice of subjecting only certain departments to" a reduction in force ("RIF") where "declining business necessitated the RIF" and "some departments were affected more than others," including departments that happened to be staffed mostly with members of protected class).

The parties argue over whether CPS's budget deficit provided a legitimate business justification for the 2011 layoffs, but the Court agrees with plaintiffs that the deficit does not seem to have actually caused the layoffs in question here; rather, the 2011 layoffs of teachers and paraprofessionals were based essentially on enrollment declines in particular schools. (*See* Def.'s LR 56.1 Resp. ¶ 1; Pls.' LR 56.1 Resp. ¶¶ 9, 16-17.) Board administrators testified at their depositions that, under the regime that existed in 2011, layoffs occurred generally in years in which there was a drop in enrollment-based quota positions or in instructional, programmatic, or discretionary funding (which funding is also based, in one way or another, on enrollment), which forced principals to close positions to balance their individual school budgets. The process of laying off teachers and paraprofessionals was essentially a mechanical, bureaucratic one that

---

[2] The parties do not address whether the safe harbor for unintentional discrimination occurring as a result of the "appl[ication of] different standards . . . to employees who work in different locations," 42 U.S.C. 2000e-2(h), protects defendant here, as the First Circuit held in its initial decision in *Abril-Rivera*, 795 F.3d 245, 254 (1st Cir. 2015) *op. withdrawn* 806 F.3d 598 (1st Cir. 2015) (Mem.). The court later withdrew that opinion because the Court had raised the safe harbor issue on its own (or "*motu proprio*," as a dissenting judge explained), without the issue having been raised or briefed by the parties. 806 F.3d at 598. The parties have not raised the issue here, either, so the Court will not address it. In its revised opinion, the First Circuit ruled that the disparate impact claim failed not based on the safe harbor in subsection (h) but because the employer had provided an unrebutted business justification for the challenged practice. *Abril-Rivera*, 806 F.3d 599, 606-08 (1st Cir. 2015).

depended on fluctuations in enrollment and enrollment-based funding, and the evidence does not show that, in 2011, it was a response to CPS's central budget deficit. (*See, e.g.*, Def.'s LR 56.1 Stmt., ECF No. 231-1, Ex. 4, Rivera Dep. 46:11-47:24, 57:1-86:1; *id.*, Ex. 5, McLellan Dep. 34:19-37:11; 55:19-98:6; *id.*, Ex. 6, Ferguson Dep. 39:7-46:14, 50:24-51:15.) Indeed, Board staff specifically floated the idea of altering the formula for calculating the number of quota positions for each school to increase the number who would be laid off in order to decrease the budget deficit, but the Board's CEO rejected the idea because this would have increased class sizes. (*Id.*, Ex. 4, Rivera Dep. 64:25-68:22.)

But it makes no difference at this stage. Regardless of CPS's central budget deficit, the enrollment declines in certain schools provided a legitimate business justification for laying off teachers and paraprofessionals who worked in those schools. CPS's system for making those staffing adjustments was a reasonable and practical method of staffing a school with the number of teachers and paraprofessionals reasonably necessary to serve the needs of the school's students, which meets the standard for employment practices that are "job-related and consistent with business necessity." Defendant has met its burden of producing evidence on this issue, and there are no genuine factual disputes as to that evidence. Thus, the burden shifts to plaintiffs to show that a less discriminatory, equally effective alternative was available.

## C. Less Discriminatory Alternative Practices

The Supreme Court has explained that, if an employer meets its burden of proving that a challenged employment practice is job related and consistent with business necessity, then "it remains open to the complaining party to show that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in 'efficient

and trustworthy workmanship.'" *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801 (1973)).

The less-discriminatory-alternative requirement, like the job relatedness/business necessity defense, was codified by the Civil Rights Act of 1991, Pub. L. 102-166, § 105(a), 105 Stat. 1071; *see* 42 U.S.C. § 2000e-2(k), but the statute does not attempt to define the requirement, apart from referring to case law. The statute provides that, if the employer shows that the challenged practice is job related and consistent with business necessity, the plaintiff may still prevail if she "makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the [employer] refuses to adopt such alternative employment practice." 42 U.S.C. § 2000e-2(k)(1)(A)(ii). "Subparagraph (C)" provides that "[t]he demonstration referred to by subparagraph (A)(ii) shall be in accordance with the law as it existed on June 4, 1989, with respect to the concept of 'alternative employment practice.'" 42 U.S.C. § 2000e-2(k)(1)(C). June 4, 1989, was the day before the Supreme Court issued its decision in *Wards Cove*, 490 U.S. at 660-61.

The upshot is that, under this framework, plaintiffs bear the burden of demonstrating that "'there was another available method . . . which was equally valid and less discriminatory that the employer refused to use.'" *Adams v. City of Chi.*, 469 F.3d 609, 613 (7th Cir. 2006) (quoting *Bryant*, 200 F.3d at 1094). Plaintiffs' showing in this regard must be specific, not general. They must demonstrate a "viable" alternative; a "vague and indefinite proposal may not" suffice. *Allen v. City of Chi.*, 351 F.3d 306, 313 (7th Cir. 2003); *see Adams*, 469 F.3d at 613. The proposal must rest on more than "mere speculation," *Allen*, 351 F.3d at 315, and it may not be merely "theor[etical]," *Adams*, 469 F.3d at 616.

Plaintiffs offer the following alternative practices: (1) conducting an adverse impact analysis before proceeding with layoffs, (2) transferring class members to open positions in other

schools where enrollment was not declining, (3) relying on factors other than enrollment to select employees for layoffs, and (4) relying on additional sources of funding, rather than laying off the class members to cut costs.

### 1. *Adverse impact analysis*

Plaintiffs' first suggested alternative practice, conducting an adverse impact analysis, is plainly not "equally valid," *i.e.*, equally well adapted to reaching a reasonably optimized and efficient level of staffing within individual schools. *See generally Ernst*, 837 F.3d at 796 (describing concept of validity, in context of studies of validity of skills testing as a criterion for hire, as "the extent to which a study accurately measures what it sets out to measure"). Nor is it even an alternative, as it has nothing to do with staffing a school. At most, it would have informed the Board of whether its 2011 layoffs were going to affect people of protected classes disproportionately; but plaintiffs do not explain, and the Court does not see, how it answers the question of what to do instead. This falls far short of plaintiffs' burden to "demonstrate a viable alternative and give the employer an opportunity to adopt it." *Allen*, 351 F.3d at 313.

### 2. *Transferring class member to open positions*

Plaintiffs' next suggest that defendant could have transferred teachers and paraprofessionals to schools with vacancies, rather than lay them off. It is undisputed that throughout the summer of 2011, the number of vacant positions for teachers and paraprofessionals in CPS schools fluctuated between approximately 1,300 and 1,500. (Def.'s LR 56.1 Resp. ¶¶ 34-37.) Further, the number of overall students in the CPS system, though it had been falling for years leading up to the 2010-11 school year, actually rose from 402,681 to 404,151 during the 2011-12 school year. (*Id.* ¶ 38.)

But these numbers establish no more than that transferring class members to open positions

might have been a viable alternative "in theory." *Adams*, 469 F.3d at 616. Plaintiffs must do more than articulate what might be a good idea in theory; they must "demonstrate the availability of an allegedly viable alternative that [defendant] refused to adopt" and that was "of substantially equal validity." *Id.* Additionally, they must demonstrate that it is more than "speculat[ive]" that the alternative practice is "less discriminatory," *i.e.*, that a "non-discriminatory pattern would result" from this alternative. *Allen*, 351 F.3d at 315. Plaintiffs fall far short of meeting this burden.

First, plaintiffs make no attempt to demonstrate how well-qualified the class members were for the vacant positions or whether the positions matched the class members training and experience, so they do not show that a transfer alternative would have been equally valid and "effective in achieving [defendant's] goals." *See Allen*, 351 F.3d at 314-15; *Adams*, 469 F.3d at 615 (plaintiffs failed to demonstrate that their alternative "was available or sufficient . . . , let alone demonstrate that such an inferior method would be equally valid"); *see also Allen*, 351 F.3d at 314 ("'Factors such as the cost or other burdens of proposed alternative selection devices are relevant in determining whether would be equally effective as the challenged practice in serving the employer's legitimate business goals.'") (quoting *Watson*, 487 U.S. at 998 (plurality op.)).

Further, plaintiffs do not establish that a transfer alternative would be less discriminatory. While "a purely lateral job transfer" is usually not an adverse employment action that gives rise to Title VII liability, *see EEOC v. AutoZone, Inc.*, 860 F.3d 564, 569 (7th Cir. 2017), it does not follow that lateral transfers are never adverse employment actions; a teacher's transfer from one school to another might well be an adverse employment action, if conditions at the second school are considerably worse, *see Hoselton v. N. Chi. Sch. Dist. 187*, No. 11 C 2313, 2012 WL 92527, at *2 (N.D. Ill. Jan. 11, 2012). Nor is it clear that the unspecified transfers plaintiffs propose would be "purely lateral"; if class members were transferred to vacant positions that did not match their

prior positions, which might well be the case for all that plaintiffs have shown, the transfer might be an adverse employment action to the extent that it is tantamount to a demotion or might harm future career prospects. *See Herrnreiter*, 315 F.3d at 744. Given that, under this alternative scenario, the closed positions still belong disproportionately to African-Americans, transferring the class members to vacant positions might have resulted in what was no less a "discriminatory pattern" than the enrollment-based layoff.

Rather than make the required showing that their proposed alternative practice of transferring class members was "available, equally valid and less discriminatory," *Allen*, 351 F.3d at 312, plaintiffs principally argue that defendant's objections to it (it would run afoul of (a) the seniority rules in the collective bargaining agreement and (b) the Illinois School Code, which requires principals to select their individual schools' teachers and staff) are wrong. But it is *plaintiffs*' burden to demonstrate affirmatively that transferring class members was a viable alternative; *i.e.*, that it was available in 2011, equally valid, and less discriminatory. *See id.* at 315 (recognizing that plaintiffs' proposed alternative practice might well be valid, but affirming grant of summary judgment for employer because plaintiffs failed to carry their burden of proof on the practice's validity). Plaintiffs do not adduce evidence sufficient to carry their burden; arguing with defendants over their objections does not suffice.

Even if the Court agreed with plaintiffs that the issue turns on defendants' objections (and it does not), the Court tends to agree with defendants that the Illinois School Code presents a formidable obstacle to the transfer alternative, to the extent it requires vacancies in schools to be "filled by appointment made by the principal in accordance with procedures established and provided by the Board." 105 ILCS 5/34-8.1. The Court interprets this provision to mean that, while the Board has flexibility in designing the hiring and application process, principals are

required to play the key decision-making role in choosing the teachers and others who will staff their schools. It is hard to see how a transfer alternative that complied with this law would differ significantly from the layoff practice the Board employed; under any transfer alternative, it seems the Board would be required at least to give the principals veto power, and some of the would-be transferees would end up left out.

It was incumbent on plaintiffs to describe with specificity how any such process would work. Plaintiffs did not carry their burden in that respect.

### 3. *Relying on factors other than enrollment*

Plaintiffs argue that the Board could have relied on factors other than enrollment projections to determine which employees to layoff. Plaintiffs do not say what these factors are, so again, as the Court explained above in Part I.C.2. of this Opinion, they do not carry their burden of demonstrating with specificity an available, equally valid, less discriminatory alternative to the Board's enrollment-based layoff practice. *See Adams*, 469 F.3d at 613-16; *Allen*, 351 F.3d at 315-16.

### 4. *Relying on additional sources of funding*

Plaintiffs argue that the Board could have relied on other sources of funding, rather than lay off the class members. But this misconceives both the employment practice that led to the 2011 layoffs and the business justification for it. The class members were laid off because enrollment had dropped in their schools, not because CPS projected a budget deficit for the following school year. The evidence shows that quota positions, instructional and programmatic positions, and positions based on discretionary funding all depended, in one way or another, on enrollment in individual schools; when enrollment dropped, the positions and funding allocated to the schools also dropped, and principals were forced to close positions and, in consultation with

the Board and CPS staff, determine which of the employees at the school to lay off. The budget deficit was a parallel problem that CPS was dealing with at the time, but not a cause of the layoffs.

Regardless, yet again plaintiffs fail to explain this proposed alternative practice in sufficient detail to carry their burden. As explained above, the evidence shows that the class members were laid off because of enrollment declines in their schools, which, according to the Board's standard bureaucratic process, meant that fewer positions and less funding were allocated to their schools. If the Board were to reallocate funding from other sources to avoid layoffs, how would the reallocation work? Would the reallocation have been sufficient to save all of the teachers and paraprofessionals who received layoff notices in 2011? If not, would the result have been less discriminatory? Plaintiffs do not answer these questions, and as the Court has explained in the preceding sections, it is their burden, not defendant's, to do so.

Because defendant has justified its enrollment-based layoff practice as job related and consistent with business necessity, and because plaintiffs do not adduce evidence sufficient to permit a reasonable juror to find in their favor on the question of whether there were less discriminatory, equally valid alternatives to that practice, defendant is entitled to summary judgment on the disparate impact claim.

## II.    DISPARATE TREATMENT

On a motion for summary judgment, where the plaintiff asserts a Title VII claim of discriminatory discharge based on race, "the sole question that matters" is "[w]hether a reasonable juror could conclude that [the plaintiff] would have kept his job if he had a different ethnicity, and everything else had remained the same." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016). Stated differently, the question for the court to determine is "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . or other proscribed

factor caused the . . . adverse employment action." *Ortiz*, 834 F.3d at 765. The Court must consider the evidence as a whole to determine whether the full evidentiary picture permits a reasonable inference that defendant's enrollment-based layoff practice is the result of intentional discrimination. *See id.*; *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994); *see also David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) ("In adjudicating a [defendant's] summary judgment motion, the question remains: has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?") (citing *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013) ("The central question at issue is whether the employer acted on account of the plaintiff's [race or other protected characteristic]."))

## A. Exhaustion

Before filing a Title VII suit, a plaintiff must file a charge of discrimination before the Equal Employment Opportunity Commission ("EEOC"). *Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 921 (7th Cir. 2007). "The test for determining whether an EEOC charge encompasses the claims in a complaint [is whether they] are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'" *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) (quoting *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.,* 538 F.2d 164, 167 (7th Cir. 1976)). Stated slightly differently, the test is satisfied "if there is a reasonable relationship between the allegations in the charge and the claims in the complaint, and the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Cheek*, 31 F.3d at 500. It must be possible to "reasonably infer" the allegations of the complaint from the charge, such that the EEOC investigation growing out of the charge is likely to provide the employer with "some warning of the conduct about which the employer is aggrieved," as well as "an opportunity to settle the dispute through conference, conciliation, and persuasion." *Id.* at

500, 503; *see Ajayi*, 336 F.3d at 527-28.

Defendant argues that plaintiffs failed to exhaust their administrative remedies for their disparate treatment claim because the charge of discrimination they filed with the EEOC mentioned only disparate impact, without so much as suggesting that defendant acted with the discriminatory intent necessary for disparate treatment.

Plaintiffs argue that defendant has forfeited its exhaustion defense by failing to raise it in its answer, and in any case, according to plaintiffs, their disparate treatment claim is reasonably related to their disparate impact claim and could reasonably have been expected to grow out of an investigation into it.

Putting aside for the moment the question of forfeiture, the Court recognizes that numerous other courts "have contrasted claims of disparate treatment and disparate impact as involving different facts and evidence, and given the significant differences between those theories, [several] circuits have held that an administrative charge raising one theory generally does not exhaust the other." *Rodriguez v. United States*, 852 F.3d 67, 80-81 (1st Cir. 2017) (citing, *inter alia*, *Diersen v. Walker*, 117 F. App'x 463, 465-66 (7th Cir. 2004) ("Diersen's disparate impact claim is conceptually and factually distinct from his allegations of disparate treatment and retaliation, and pursuing the latter does not exhaust the former.") (citing *Noreuil v. Peabody Coal Co.,* 96 F.3d 254, 258-59 (7th Cir. 1996))).

But even conceptually distinct claims may have a sufficiently close relationship if they are "so related and intertwined in time, people, and substance that to ignore that relationship for a strict and technical application of the rule would subvert the liberal remedial purposes of the statute." *Kristufek v. Hussmann Foodservice Co.,* 985 F.2d 364, 368 (7th Cir. 1993); *see Tomao v. Abbott Labs., Inc.*, No. 04 C 3470, 2006 WL 2425332, at *12 (N.D. Ill. Aug. 16, 2006) ("Tomao does not

mention retaliation in her EEOC charge, but the allegations certainly describe the same conduct and implicate the same individuals as the discrimination claims.") (citing *Cheek*) *denying reconsideration* 2007 WL 2225905, at *7 (N.D. Ill. July 31, 2007) (citing *Kristufek*). In this case, the disparate impact and disparate treatment claims appear to be so intertwined in time, people, and substance that it would make no practical sense to consider the first exhausted but the other not. For the disparate treatment claim, plaintiffs essentially take the same evidence supporting the disparate impact claim and argue for an inference of intentional discrimination (indeed, as the Court will explain, the failure to point to other evidence indicating discriminatory intent is the disparate treatment claim's fatal flaw). *Cf. Noreuil*, 96 F.3d at 258 (EEOC charge raising retaliation claim did not exhaust disparate impact claim because statistical evidence was necessary to resolve the second claim but not the first, and, unlike in *Kristufek*, the claims were not factually or temporally intertwined). Given this close relationship, plaintiffs are not barred from asserting their disparate treatment claim for failure to exhaust administrative remedies. The Court need not reach the issue of whether defendant has waived the affirmative defense because, regardless, it lacks merit.

### B. Merits of Disparate Treatment Claim

As the Court explained in Part I.A., plaintiffs have produced significant statistical evidence that African-American teachers and paraprofessionals were laid off in disproportionately large numbers, as compared with employees of other racial backgrounds. This sort of evidence can be relevant to a disparate treatment claim, as well as a disparate impact claim. *See EEOC v. Sears, Roebuck & Co.,* 839 F.2d 302, 312 (7th Cir. 1988). But under a disparate treatment theory, plaintiffs must prove that the statistical disparity is the result of intentional discrimination, and in this case, as the Court has explained, the statistical evidence is rebutted in that regard by undisputed

evidence that the layoffs were *not* the product of intentional discrimination; rather, they were the product of a regular bureaucratic process by which the number of positions and amount of funding allocated to particular schools dropped when the schools' enrollment dropped, which triggered layoffs if the drop in positions and funding impelled individual principals to close positions to balance school budgets.

Plaintiffs argue that there is nevertheless sufficient evidence to create a genuine issue of material fact because (1) the Board was aware or should have been aware that its 2011 layoffs would disproportionately affect African-American teachers and paraprofessionals, but it proceeded with them anyway, and (2) the Board's budget deficit was a pretext for the layoff; as evidenced by the Board's inability to explain how far the layoffs went toward closing the deficit.

First, plaintiffs have not cited evidence showing that the Board was aware that the 2011 layoffs would disproportionately affect African-American teachers and paraprofessionals. Plaintiffs purport to cite such evidence in paragraph 45 of their Local Rule 56.1 Statement, but the Court agrees with the Board that the cited testimony does not establish that the Board knew that the 2011 layoffs would disproportionately impact African-American teachers and staff, and no reasonable juror could find otherwise. But even if plaintiffs are correct that the Board should have known the racial makeup of the employees in the schools where layoffs were likely, the Court fails to see how the Board's mere awareness that the layoff might disproportionately affect African-American teachers and paraprofessionals tends to demonstrate its intent to discriminate against them. Again, the undisputed facts show that the Board had a general bureaucratic mechanism for adjusting the levels of staffing and funding in its individual schools based on changes in the enrollment of those schools, which the Court has already found to be reasonable and practical, and which operated throughout the entire CPS system, not just in the class members' schools. The

process was driven by numbers and (at the individual school level, sometimes) seniority, without accounting for race. There was no exercise of discretion that might have been infected by a discriminatory motive except at the principal level; but plaintiffs do not make any claim that the individual principals discriminated against the class members. Further, the fact that the process may have disproportionately affected African Americans in a particular year, even assuming the Board knew that it had, was not necessarily a reason to alter the result of the process; indeed, to the contrary, in doing so the Board might have exposed itself to a separate claim of disparate treatment of those teachers and staff belonging to *other* racial groups. *See Ricci*, 557 U.S. at 579.

Plaintiffs cite *Porter v. Pipefitters Association Local Union 597*, No. 12 C 9844, 2018 WL 3574757, at *7 (N.D. Ill. July 25, 2018), in support of their position, arguing that summary judgment for the defendant must be denied if a reasonable factfinder could "draw an inference" that the defendant knew its practices would lead to discrimination. But that case is inapposite because the court in *Porter* was talking about a defendant who knows that its practices will result in *intentional* discrimination; the defendant was a labor union that allegedly knew that its referral practices facilitated contractors' intentional discrimination against African-American members. There is no evidence that the Board was aware of any intentional discrimination in or around the time of the 2011 layoffs or at any time thereafter.

As for whether the Board used the budget deficit as pretext, evidence of pretext is only probative of discrimination to the extent that a reasonable factfinder might infer that, because the employer lied about its reasons, the real reason was intentional discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("But a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason."). But as the Court has already explained, the undisputed facts would not support

any such inference in this case, regardless of the true facts and circumstances of the 2011 budget deficit, because the layoff was the product not of the Board's central budget deficit but of its regular process of adjusting staffing and funding in individual schools based on enrollment, and the evidence does not show that the process was infected by intentional discrimination. Any potential inference of intentional discrimination is simply crowded out by these undisputed facts.

For these reasons, no reasonable juror could find that the Board intentionally discriminated against plaintiffs in imposing the 2011 layoffs. Defendant's motion for summary judgment is granted on the disparate treatment claim, and plaintiffs' is denied.

## III.    STANDING

Defendant argues that, even if "any portion of plaintiffs' suit survives summary judgment" (Def.'s Mem. at 23, ECF No. 230), it is nevertheless entitled to summary judgment against CTU because CTU has no standing to assert plaintiffs' claims in this case. According to defendant, CTU's claim is invalid because CTU never properly authorized this suit, nor could it because, if CTU prevails, some CTU members will benefit to the detriment of others. But the Court need not resolve this issue because it has concluded that no "portion of plaintiffs' suit survives summary judgment," in any case.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment [247] is denied, and defendant's motion for summary judgment [229] is granted. The parties' *Daubert* motions [228, 241] are denied as moot.

SO ORDERED.                                    ENTERED: January 3, 2020

_____
**HON. JORGE ALONSO**
**United States District Judge**